MACMAHAN PHARMACAL CO. v. DENVER CHEMICAL MFG. CO.

(Circuit Court of Appeals, Eighth Circuit. December 16, 1901.)

No. 1,572.

1. TRADE-MARKS—COMMON-LAW RIGHT—HOW ACQUIRED.

The common-law right to the exclusive use of a word, symbol, or device as a trade-mark is not given merely by its adoption as such, but it must also have been used for such a length of time, and under such circumstances, as to identify the goods in connection with which it is used to the trade as those of a particular manufacturer or dealer as distinguished from those of other manufacturers or dealers.

2. SAME—NECESSITY OF PUBLIC USE.

A pharmacist in New York City for 20 years made and sold a liquid preparation for use by dentists under the name of "Macmahan's Concentrated (or saturated) Tincture, Acon te, with Iodine." After that time he was succeeded by a corp: ration which continued to make and sell the preparation, adding to the above designation on the labels the word "Antiphlogistine." On cards and circulars it was described by the name "Macmahan's Antiphlogistine," but such cards or circulars were not shown to have been distributed to any extent, and the preparation was not advertised in any other manner. In 10 years the company made but 362 sales, to 98 different customers, almost exclusively dentists, who purchased for their own use. The article was not known in the market generally, nor even to pharmacists in the city. *Held*, that such company did not have an exclusive right to the use of the word "Antiphlogistine" as a trade-mark, and especially as against another company which had adopted it, without knowledge of such use as a trade-mark, to designate a plastic preparation not adapted to the use of dentists, but intended for external application, and which, during a number of years, it had advertised extensively, and in which it had built up an extensive trade.

3. SAME—TRANSFERABILITY—DISASSOCIATION FROM ARTICLE.

A trade-mark is not by itself such property as can be transferred, and the right to use it cannot be assigned except as incidental to the transfer of the business or property in connection with which it has been used. A transfer of the right to use it in connection with a different article, or one of a different manufacture, would result in deceiving the public as to the article or its origin, which it is the sole legitimate purpose of a trade-mark to prevent, and a transferee will not be protected in such use by a court of equity.

Appeal from the Circuit Court of the United States for the District of Colorado.

In the year 1867 one Thomas J. Macmahan, a druggist of New York City, prepared a liquid mixture of tinctures of aconite and iodine for the use of dentists, and labeled it thus:

"POISON.
Sat. Tinct. Aconite Root,
with Iodine.
Prepared Expressly for Dentists' Use by
T. J. Macmahan.
138 Sixth Av., bet. 10th & 11th Sts.,
New York."

Macmahan's general drug business consisted of the manufacture and sale of dental preparations, like tooth powder and mouth wash. He carried on that part of the business, consisting of putting up and selling the above-mentioned mixture, in a very small way under the name "saturated" or "concentrated tincture of aconite and iodine," until the year 1890, when he sold and transferred his entire business to the appellant, the Macmahan Pharmacal Company, a corporation then organized in New York by him to take over and conduct the same. He at once became, and has ever since continued to be, the vice president, treasurer, and general manager of the corporation. Between December 27, 1889, and October 8, 1900, when a new set of books was opened by the corporation, his private sales book shows that eight sales of the mixture in question were made by him and noted on his sales book as "Antiphlogistine," which word he claims to have adopted some time in 1889 as his trade-mark. The corporation soon made a change in the label for the mixture, and thereafter employed the following:

"POISON.
MACMAHAN'S
Concentrated Tinct. Aconite,
WITH IODINE.
ANTIPHLOGISTINE.
Prepared Expressly for Dentist's Use by
MACMAHAN PHARMACAL CO.,
No. 172 Sixth Ave., New York."

This mixture was put up in one-ounce bottles, on which was pasted the label. The business done by the corporation between 1890, when first organized, and April, 1900, when Macmahan's testimony was taken, in selling the mixture was as follows: Total number of sales, 362; gross amount of sales, $514.18; total number of customers, 98. The sales were made almost exclusively to dentists and dental supply houses in New York City. In a very few instances they were made on the prescription of general practitioners for other purposes. No advertisement of the mixture in question appears ever to have been made in newspapers or journals of the day by the Macmahan Company. The record shows that it had a business card as follows:

## The Macmahan Pharmacal Co.,

### Manufacturing Chemists,

SOLE PROPRIETORS OF
MACMAHAN'S
HANDICAP TOOTH POWDER.

MACMAHAN'S
EAU FAVORITE, A LIQUID DENTIFRICE.

MACMAHAN'S
ANTIPHLOGISTINE.

## 142 Sixth Avenue,

### New York.

—and also that it prepared at different times between 1890 and 1900 two circulars which were employed by it as the interior wrapper of the bottles. These circulars gave the origin and history of the mixture and some of the uses to which it might be put, and each had a heading, in large letters, thus: "Macmahan's Antiphlogistine." There is some proof also to the effect that the company had letterheads, billheads, and envelopes substantially like the business card, but when they were first employed, or how long, or how extensively, they were used, does not appear. Accordingly, it is safe to say that the only substantial evidence of knowledge on the part of the public of the use of the word "Antiphlogistine" by the Macmahan Company is such as has been conveyed to it by the label last referred to, pasted on the bottle itself, and on its outside wrapper, and such as may have been discovered from an inspection of the circular constituting the

inside wrapper of the bottle, in connection with the fact that 98 different persons, during the 10 years following the incorporation of the company, purchased some quantity of the mixture, presumably wrapped in the circular. The evidence in relation to the card, letterheads, billheads, and envelopes is so unsatisfactory, as to the time when they were used, that they are of no substantial value as evidence of knowledge on the part of the public of their contents. On the other hand, the evidence of two experienced pharmacists of New York, who were produced by the Macmahan Company as witnesses in its behalf, tends to show that its mixture was not known among the pharmacists of New York by the name of "Antiphlogistine," or by any other name, and that the preparation known there by that name was one made by the Denver Chemical Manufacturing Company, the appellee. This last-named company was organized as a corporation in 1893, and immediately engaged in business at the city of Denver, Colo. It appears from the record that between the years 1890 and 1893 one Dr. Sheets, a physician of Denver, compounded a certain medicinal preparation, consisting of a soft, plastic, antiseptic dressing, intended for external use only. Without any knowledge that the word "Antiphlogistine" had ever been employed by Macmahan, or any other person, as a trade-mark for the sale of liquid dentifrice, or any other article of merchandise, Sheets adopted the word as his trade-mark, and forthwith used it in connection with the sale of his preparation. The Denver company was incorporated for the purpose of acquiring the right to manufacture and sell the preparation of Dr. Sheets, as he had done. It afterwards acquired the same, and has since then carried on the business of manufacturing and selling that preparation solely. From the beginning, the Denver company advertised it extensively and at great expense, throughout the United States, Canada, and England, as "Antiphlogistine." The sales rapidly increased from year to year from 1894, when it sold 3,521 pounds, until 1900, when it sold 138,950 pounds. In April, 1895, the defendant company took the requisite steps, pursuant to the requirement of the act of March 3, 1881 (21 Stat. 502), to secure, and did secure, registration of its trade-mark. In October, 1896, this company for the first time received information by letter from the Macmahan Company that it claimed the exclusive right to the use of the word "Antiphlogistine" as its trade-mark. Dr. John Campbell was at that time one of the largest stockholders, a director, and for nearly five years had been president, of the Denver Company. In 1896 he was in New York engaged in prosecuting its business there. The communication from the Macmahan Company was referred to him for inquiry. He made an investigation, and reported to his company that Macmahan's preparation was a liquid, and not at all like the plastic compound of his company, that it was used exclusively by dentists, and known to but very few, and that there was no conflict between the two preparations. Nothing further was heard from the Macmahan Company until October, 1897, when Macmahan again wrote, notifying the Denver Company of his claim. Some correspondence ensued between counsel of the parties, but it ended in February, 1898. Soon after that, some disagreement arose between Dr. Campbell and the officers of his company, which resulted in his severing his connection with the company, resigning as an officer and selling out his stock. In April, 1899, Dr. Campbell entered into a written contract with the Macmahan Company, reciting that that company had been "engaged in making and selling a medicinal preparation intended for external application in liquid form" under the name "Antiphlogistine," and that Dr. Campbell had "devised, and is about to manufacture and sell, a medicinal preparation, not in liquid form, for external use, which he desires to make and sell under the said name 'Antiphlogistine,'" and concluding with an agreement conferring upon Campbell the right to use the word "Antiphlogistine" to designate his preparation, with a covenant on the part of the Macmahan Company not to sue Campbell for such use, but obligating Campbell to pay 5 per cent. of his gross sales to the Macmahan Company as a license fee for the privilege of using the word. This agreement also contained a provision as follows: "Fifth. Upon being requested so to do, and upon being duly indemnified for all expenses, costs, and charges which it may incur, the party of the first part [the Macmahan Company], its successors or assigns, shall bring such suits.

actions at law, or take such other proceedings as the party of the second part [Campbell] or his assigns shall desire, to prevent the use of said word 'Antiphlogistine' by any other person or persons, in or about the sale of any medicinal preparation." Shortly afterwards Campbell requested the Macmahan Company to institute this suit, and it was accordingly done, in the name of the Macmahan Company as complainant, but at the expense and for the benefit of Dr. Campbell, pursuant to the aforesaid agreement. The general object and purpose of the suit was to enjoin the Denver Company, defendant below, from using the word "Antiphlogistine" in connection with the sale of its compound, on the ground that the Macmahan Company had the exclusive right thereto as a trade-mark. In due course of time it was brought on for a hearing on the facts, as hereinbefore substantially narrated, and resulted in a decree dismissing the bill. The substantial error assigned is that the circuit court erred in refusing to enjoin the defendant as prayed, for the reason, as is claimed, that the complainant had acquired the exclusive use of the word "Antiphlogistine" as a trademark for its mixture.

Lysander Hill, for appellant.

Edmund Wetmore (William G. Edwards, on the brief), for appellee.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge, after stating the case as above, delivered the opinion of the court.

This is an action to restrain the alleged infringement of a specific trade-mark. No claim is made that defendant's goods are so put upon the market as to induce or tend to induce purchasers to buy them as and for the goods of complainant. In fact the packages containing them are so dissimilar in character, size, dressing, and display from the complainant's packages that it is impossible that any person could be deceived with respect to them, or that defendant could palm off its goods as and for those of complainant; and no claim is made that defendant adopted the word "Antiphlogistine" as its trade-mark with any knowledge that complainant or its predecessor had ever either adopted or used the same for any purpose whatsoever. No question, therefore, of fraudulent purpose or intent on the part of the defendant to circumvent the complainant or deceive the public is raised by this record.

Defendant concedes that it has made use of the word as its trade-mark continuously and extensively from and after 1893 to the present time, and claims that it has a legal right to continue so doing. It contends that complainant never acquired the exclusive right to the use of the word at all, and if it did that it was limited to use upon that particular class of merchandise known as "liquid dentifrice," with which alone it was associated.

The right to a trade-mark at common law, independent of the registration statute, is not created by invention or priority of adoption alone. A word, symbol, or device, to be a valid trade-mark constituting a right of property, must have been used by the owner in connection with the sale of his goods for such length of time, and under such circumstances, as indicates to the trade that the goods in connection with which it appears are his goods, as distinguished from those of other manufacturers or dealers. The mere adoption of such word, symbol, or device, unaccompanied by such

a use, is not sufficient to create an exclusive right thereto. Mr. Justice Clifford in the leading case of McLein v. Fleming, 96 U. S. 245, 251, 24 L. Ed. 828, 831, expresses the rule thus:

"Where, therefore, a party has been in the habit of stamping his goods with a particular mark or brand, so that the purchasers of his goods, bearing that mark or brand, know them to be of his manufacture, no other manufacturer has a right to adopt the same stamp."

In the Trade-Mark Cases, 100 U. S. 82, 94, 25 L. Ed. 550, 552, Mr. Justice Miller, speaking for the court, says:

"The ordinary trade-mark has no necessary relation to invention or discovery. The trade-mark recognized by the common law is generally the growth of a considerable period of use, rather than a sudden invention. * * * At common law the exclusive right to it grows out of its use, and not its mere adoption."

In the case of Levy v. Waitt (decided by the circuit court of appeals for the First circuit) 10 C. C. A. 227, 61 Fed. 1008, 1011, 25 L. R. A. 190, in a case somewhat analogous to that now before us, it is said:

"It seems to have been assumed in the discussions of this case that the common-law right to a trade-mark comes more from selection or discovery than from actual occupation of the market. * * * But this is not the law. The right to a trade-mark at common law must not be confused, as it too frequently is, with the prima facie right existing under registration statutes. It arises to such a limited extent from the mere matter of selection or discovery of the name or symbol used that this may be of trivial consequence."

The court then adopts the language employed by Vice Chancellor Sir W. Page Wood in Collins Co. v. Brown, 3 Kay & J. 423, as a good compendium of the common law of trade-mark, as follows:

"The simple question in these cases is, has the plaintiff, by the appropriation of a particular mark, fixed in the market where his goods are sold a conviction that the goods so marked were manufactured by him?"

In the case of McAndrew v. Bassett, 4 De Gex, J. & S. 380, 386, Lord Westbury states that property in words stamped upon a vendible article exists when "the article goes into the market so stamped, and there obtains acceptance and reputation, whereby the stamp gets currency as an indication of superior quality, or some other circumstance which renders the article so stamped acceptable to the public." To the same effect are the following cases: George v. Smith (C. C.) 52 Fed. 830; Tetlow v. Tappan (C. C.) 85 Fed. 774; Hygeia Distilled Water Co. v. Hygeia Ice Co., 70 Conn. 516, 533, 40 Atl. 534.

According to the rule hereinbefore announced, the present case must be decided by answering the following question: Did the complainant make such use of the word "Antiphlogistine" in connection with its medicinal preparation as to cause it to be known and recognized in the market by that word? For a period of over 20 years, beginning in 1867, the preparation in question had been sold and known (if at all) by the name "Saturated" or "Concentrated Tincture of Aconite and Iodine, Prepared * * * by T. J. Macmahan." Afterwards, at about the time of the formation of the complainant corporation in 1890, the word "Antiphlogistine" first appeared on the label, but it then, and continuously thereafter,

appeared immediately and prominently associated with the name of the discoverer of the preparation, the person who had been handling it and selling it for a period of 20 years theretofore.  In that label the attractive and suggestive feature is the old word "Macmahan's." There was apparently a purpose manifested by the new corporation to continue the name by which the preparation had been so long known, and, accordingly, the label reads "Macmahan's Concentrated Tincture of Aconite, with Iodine.  Antiphlogistine."  Obviously the word "Macmahan's" was intended to be a catchword descriptive of the preparation; otherwise there would have been no necessity for using it at all.  It was not thereby intended to indicate that the preparation was manufactured by the Macmahan Pharmacal Company, because that fact is explicitly stated at the bottom of the label.  The only two circulars shown by the proof ever to have been published by complainant bear a striking heavy-leaded caption, not "Antiphlogistine," but "Macmahan's Antiphlogistine."  The business card, billheads, letterheads, and envelopes also show that complainant was not content to describe its preparation as "Antiphlogistine" alone, but each and all of them have the forerunner "Macmahan's."  For the reasons appearing in the statement of the case to the effect that there is no evidence as to when, or how long, or how extensively the business cards, billheads, letterheads, and envelopes were used, they afford no substantial evidence of the existence of the trade-mark prior to its adoption by the defendant, but they nevertheless evince a consistent attitude on the part of complainant to make the word "Macmahan's" a part of its trademark  From the foregoing, we can readily understand that the decoy prescriptions shown to have been sent to old-established pharmacists in New York, calling for "Antiphlogistine" alone, shortly before the evidence was taken in this case, were not filled by using "Macmahan's Antiphlogistine."  The pharmacists did not recognize the word "Antiphlogistine" as complainant's brand.  Not only so, but the limited sales of the preparation by any name indicate an unfamiliarity with it certainly as "Antiphlogistine."  Ninety-eight different persons only inquired for it during the decade following the supposed adoption of the trade-mark in question, and the aggregate amount paid by them for all the purchases made amounted to the sum of $514.18 only.  There is no evidence in the record showing that complainant's preparation was kept in drug stores generally for sale.  On the contrary, the only fair inference from all the evidence is that it was manufactured in very small quantities, kept for sale exclusively by complainant, advertised little if any, sold infrequently and in small quantities, and most generally to dentists located in near proximity to complainant's drug store, unknown to the trade generally by any name, and when known in the region where sold it was not known as "Antiphlogistine" but "Macmahan's Antiphlogistine."  Such being the evidence, we are of opinion that complainant's mixture had obtained no such acceptance or reputation in the trade under the name "Antiphlogistine" as to confer upon complainant a right of property in that word alone.  The test laid down by the supreme court, in cases supra, is not met.  The use was not sufficient to ripen into a right of

property. The mark "Antiphlogistine" on any package would not have been recognized by the trade as evidence of its origin, or as an indication of complainant's ownership. It follows that defendant's large and prosperous business, innocently and at great expense organized and developed by the use of this same word under the circumstances shown by the proof, cannot be destroyed on complainant's claim of a superior right thereto.

The question was much argued by counsel whether the liquid dentifrice of complainant prepared and offered for sale in small bottles is of the same class of merchandise as the plastic compound of defendant, prepared and offered for sale in tin cans. It is true both of them are intended, in a general sense, to reduce inflammation, but complainant's is practically a dental remedy, employed almost exclusively in connection with the teeth, while the defendant's is a general remedy, inapplicable to the use of dentists, but intended for and solely applicable to external use as a substitute for ordinary poultices, blisters, and counterirritants. It is conceded that if these were different classes of merchandise, within the accepted meaning of those words, in their relation to trade-mark, then each party might adopt and use the same trade-mark, as there would be no danger of confusion resulting therefrom. We, however, do not deem it necessary for the disposition of this case to pass upon the main question so argued. We feel, however, constrained to say this much, that, in our opinion, the complainant, by undertaking to sell the right to use the word in question to Dr. Campbell for his use in handling plastic compounds, evinced an intention to abandon its claim to the trade-mark, except in connection with its liquid preparation, and cannot claim in a court of equity that it does not belong to a separate class of plastic compounds, or that it will be damaged by defendant's use of the same word in connection with its plastic compound. In fact the complainant is making no such claim. This suit is prosecuted by Dr. Campbell, not for complainant's benefit, but for his own. He was a prominent executive officer, and largely interested in defendant corporation, had participated in the early and continued struggles of the company to secure a trade for its compound, had necessarily known and approved of the large outlays of money for advertising it as "Antiphlogistine," and had on behalf of his company investigated complainant's claim, and pronounced it invalid. For reasons unexplained, he afterwards sold his stock, resigned his position as an officer of the defendant company, made the contract referred to with complainant, and caused this suit to be instituted. The main purpose of the contract was to transfer from complainant company to Dr. Campbell the right to use the word "Antiphlogistine" as a trade-mark for his preparation, which, by agreement, was not to be in "liquid form." There was no transfer to him of complainant's business, or any part of it, and no license to operate at complainant's place of business. The sole purpose was to separate what complainant called its trade-mark, reserving to itself the right to use it on its preparation in liquid form, and transferring it to Dr. Campbell for his use on preparation not in liquid form. This contract betrays a false conception of the character of trade-mark property. A trade-mark cannot be assigned,

or its use licensed, except as incidental to a transfer of the business or property in connection with which it has been used. An assignment or license without such a transfer is totally inconsistent with the theory upon which the value of a trade-mark depends and its appropriation by an individual is permitted. The essential value of a trade-mark is that it identifies to the trade the merchandise upon which it appears as of a certain origin, or as the property of a certain person. When its use has been extensive enough to accomplish that purpose, and not till then, it becomes property, and when it so becomes property it is valuable for two purposes: (1) As an attractive sign manual of the owner, facilitating his business by its use; (2) as a guaranty against deception of the public. By familiarity with the trade-mark attached to the owner's merchandise, purchasers are enabled to buy what they desire, and are thereby protected against imposition and fraud. Disassociated from merchandise to which it properly appertains, it lacks the essential characteristics which alone give it value, and becomes a false and deceitful designation. It is not by itself such property as may be transferred. Browne, Trade-Marks (2d Ed.) § 363; Heinisch's Sons Co. v. Baker (C. C.) 86 Fed. 765; Kidd v. Johnson, 100 U. S. 617, 620, 25 L. Ed. 769. To sustain complainant's contention in this case would, in effect, permit Dr. Campbell to commence a new business in 1899, with which he had theretofore in no manner been associated, and, on complainant's theory of its own exclusive right thereto, to falsely certify to the public that the merchandise manufactured and sold by him was in fact manufactured and sold by complainant. Not only this, but it would enable Dr. Campbell to antagonize the defendant's right to use the trade-mark which he himself had for six years recognized as valid and had encouraged the defendant to expend large sums of money in perfecting and establishing a business under its supposed protection. The language employed by the supreme court of the United States in Medicine Co. v. Wood, 108 U. S. 218, 223, 227, 2 Sup. Ct. 436, 439, 442, 27 L. Ed. 706, 708, 709, is so apposite to the situation disclosed by this record that we cannot refrain from quoting it.

"If one affixes to goods of his own manufacture signs or marks which indicate that they are the manufacture of others, he is deceiving the public and attempting to pass upon them goods as possessing a quality and merit which another's skill has given to similar articles, and which his own manufacture does not possess, in the estimation of purchasers. * * * Those who come into a court of equity, seeking equity, must come with pure hands and a pure conscience. If they claim relief against the frauds of others, they must themselves be free from the imputation. If the sales made by the plaintiff and his firm are effected, or sought to be, by misrepresentation and falsehood, they cannot be listened to when they complain that, by the fraudulent rivalry of others, their own fraudulent profits are diminished. An exclusive privilege for deceiving the public is assuredly not one that a court of equity can be required to aid or sanction. To do so would be to forfeit its name and character."

The foregoing quotations are alone applicable on the fundamental theory of the complainant in this case, namely, that it had made such use of the word "Antiphlogistine" as its trade-mark that the public recognized it, when found on any packages either of liquid or plastic medicinal preparations, as convincing evidence that they were put up

by complainant company. On that theory, Dr. Campbell's use of the mark on his preparations would be such a flagrant imposition upon the public that no court of equity would permit, much less facilitate, it.

We are of opinion, for the reasons hereinbefore stated, that complainant never acquired any right of property in the word "Antiphlogistine" as a trade-mark, and, if it had, that the business arrangement made with Dr. Campbell forfeited all right to the equitable relief prayed for in this action.

Other interesting questions arising in this case were argued at the bar, but in the view we have taken of the propositions already discussed it becomes unnecessary to express our views concerning them.

The decree of the circuit court dismissing the bill was undoubtedly correct, and is accordingly affirmed.