### INDEPENDENT BAKING POWDER CO. v. BOORMAN.

(Circuit Court, D. New Jersey. January 20, 1910.)

1. TRADE-MARKS AND TRADE-NAMES (§ 33*)—ASSIGNMENTS—VALIDITY.

A manufacturer cannot make a valid assignment of a trade-mark separate from a transfer of the good will and business in connection with which it was used.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. § 33.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 33*)—ASSIGNMENT—VALIDITY.

Manufacturers of a baking powder, which they sold under four or five different trade-names, assigned one of such names to another, with the right to use it as a trade-mark for baking powder, but continued as before to manufacture and sell the same product under some one of the other names. Held, that the trade-mark could not be so separated from the product with which it had been associated, and that the assignee acquired no exclusive right thereto which he could transfer.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. § 33.*

Assignment of right to use a person's name, see notes to R. W. Rogers Co. v. Wm. Rogers Mfg. Co., 17 C. C. A. 579; Kathreener's Malzkaffee

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Medicine Co., 27 C. C. A. 360.]

3. TRADE-MARKS AND TRADE-NAMES (§ 32*)—EXTINGUISHMENT—APPLICATION TO DIFFERENT PRODUCT.

A manufacturer of a baking powder in which the acid constituent was alum, and which was sold under the name "Solar" as a trade-mark, lost all rights it possessed in such trade-mark by transferring it to a baking powder in which phosphate was substituted for alum.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 36; Dec. Dig. § 32.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 22*)—PERSONS ENTITLED—NATURE AND PURPOSE OF USE.

Manufacturers of baking powder, which they sold under different names, used the name "Solar" thereon when they desired to sell at a reduced price to meet competition, at other times selling the same article at a higher price under one of the other names. *Held*, that such use of the name was not for true trade-mark purposes, and that no trade-mark rights were thereby acquired therein which would be protected by a court of equity.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 22.*]

In Equity. Suit by the Independent Baking Powder Company against Richard P. Boorman. On final hearing. Decree for defendant.

Archibald Cox, for complainant.
Philip Carpenter, for defendant.

CROSS, District Judge. The controversy in this suit is over the use of the word "Solar" as a trade-mark for a baking powder. The case has already been before Judge Gray, of this circuit, upon exceptions to the answer, and his opinion thereon may be found reported in 130 Fed. 726. A summary of the pleadings in the case made by that learned judge, will be found in his opinion and need not be here repeated. It is not disputed that the word "Solar," in and of itself, constitutes a proper trade-mark. The controversy is rather as to whether the right to its use belongs to the complainant, or to the Solar Baking Powder Company, which manufactured the product which the defendant, who is a dealer, admittedly sold.

In behalf of the complainant, it is claimed, under the evidence, that it and its predecessors in business have continuously used the name "Solar" in the manufacture and sale of baking powder since 1886; that the name was originally adopted by the firm of Sherman Bros. & Co., of Chicago, during or shortly prior to that year; that after its adoption it was used continuously as a distinguishing mark for baking powder manufactured and sold by them until March, 1900, when they sold to one William C. Engler such trade-mark "and the right to the use thereof as a trade-mark for baking powder, and also the said label (a copy of which was attached to the assignment) and the right to manufacture and sell baking powder under that name and label"; that shortly afterwards Engler proceeded to organize and did organize the complainant corporation, and in May of that year transferred all of the rights that he had received from Sherman

Bros. & Co. to the complainant, which has ever since been manufacturing and selling powder in packages bearing that trade-mark.

The defendant insists, for reasons which will be hereafter considered, that under the evidence the complainant has no right to the mark, but that it belongs to the Solar Baking Powder Company, and in furtherance of such insistment claims that certain persons by the name of Wardman and Holmes began the manufacture and sale of baking powder under the name "Solar" in October, 1889; that the following month they incorporated a company known as the Fidelity Manufacturing Company, for the purpose of carrying on said business, and assigned to it all of their rights, including said trade-mark; that said business was thereafter carried on by the Fidelity Company until the month of October, 1901, when it in turn transferred its rights therein and in said mark to the Solar Baking Powder Company, which has since carried on the business of manufacturing and selling baking powder under the name "Solar"; and that it was in the course of its said business that it sold to the defendant the "Solar" baking powder complained of.

It is apparent, from what has been said, that if the claims of the complainant are properly supported by the evidence, it and its predecessors in business used the trade-mark in dispute for several years prior to its use by the Solar Baking Powder Company and its predecessors. It is also manifest, as the defendant's counsel states in his brief, that the "principal question to be decided is whether the complainant is the owner of any exclusive right in the word 'Solar' as applied to baking powder."

At the outset of the discussion, it should be stated that Sherman Bros. & Co. did not register said trade-mark, for the reason, as alleged, that they were advised that registration under the former trade-mark law did not afford sufficient protection to warrant it. It also appears that no effort was made, either on behalf of the complainant or the constructive defendant, the Solar Baking Powder Company, to register it, until the year 1900, when the Fidelity Manufacturing Company, the immediate predecessor in business of the Solar Baking Powder Company, applied for its registration, and shortly afterwards the complainant filed a like application. An interference between the two claimants was thereupon declared, which, after examination, was decided by the examiner of interferences in favor of the complainant herein. An appeal from his decision was thereupon taken by the Fidelity Manufacturing Company to the Commissioner, who affirmed the decision of the examiner. Substantially the same record is now presented that was before the examiner and Commissioner, and the same defenses, except such as were eliminated by Judge Gray in dealing with the exceptions to the answer, are herein urged that were then urged. The grounds of defense are numerous, but comparatively few of them will be considered.

It appears by the evidence that the baking powder to which the name "Solar" was attached by Sherman Bros. & Co., before its transfer to Engler, was an alum powder. The original name impressed by that firm upon this kind of baking powder was "Empress." After

using that name for several years, they adopted some four or five other names, including "Solar," for that identical baking powder. Engler bought from Sherman Bros. & Co. that trade-name only, with the right to manufacture and sell, not alum baking powder, but baking powder with that name affixed. After the transfer to Engler, Sherman Bros. & Co. discontinued the use of the name "Solar," but continued as before to manufacture "Empress" baking powder, and affixed thereto all of the names it had previously affixed, except that of "Solar." In other words, they did not transfer to him the business of manufacturing alum baking powder under the name of "Solar," or their good will in respect thereto, but kept their business and continued to manufacture identically the same powder and sell it under the same symbols under which it had previously been sold, save that they did not use the name "Solar." The evidence shows conclusively that the alum baking powder sold by Sherman Bros. & Co. under the five different trade-names were all taken from a common source of supply. The different powders differed only in name.

Counsel for the defendant strenuously argues that the assignment from Sherman Bros. & Co. to Engler was invalid, for the reason that it was executed in their name by a person claiming to act in their behalf under a written power of attorney, which was not produced or proved. But, passing that, and assuming that the evidence shows that the transfer of the symbol "Solar," together with the right to manufacture and sell baking powder under that name, was made, the more serious question remains whether or not an assignment of that character passed to Engler the rights of Sherman Bros. & Co., whatever they were, in the name "Solar"; for, if they did not thus pass, it is clear that Engler could not have transferred them to the complainant. He could not transfer what he had not acquired. The law is well settled that a trade-mark cannot be transferred by itself. The good will and business must pass with it, or the transfer is invalid. In Bulte v. Igleheart Bros. et al., 137 Fed. 492, 70 C. C. A. 76, Judge Jenkins, speaking for the Circuit Court of Appeals of the Seventh Circuit, says at page 498 of 137 Fed., page 82 of 70 C. C. A.:

"A trade-mark is analogous to the good will of a business. Whoever heard of a good will being sold to one while the original owner continues the business as before? The good will is inseparable from the business itself. So, likewise, is a trade-mark or trade-name that gives assurance to a purchaser that the article upon which is stamped the trade-mark or trade-name is the genuine production of the manufacturer to whom the trade-name or trade-mark points by association as the maker of the article. Therefore it is that it is a necessary qualification to the assignability of a trade-mark that there goes with it the transfer of the business and good will of the owner of the symbol"—citing many cases. "There is here no pretense of the transfer of Meyer & Bulte of the business of the originators of this trade-mark, or of their successors in business. They have continued up to this time the manufacture of flour as before. It was a bald attempt to sell the trade-mark disassociated from the business in which it had been used, and in which it had acquired its value by association with the manufacture of flour by the originator and his successors. It was subsequently used by the complainants at another place, and upon their own manufactures. To uphold such a transfer would be to ignore the fundamental office of a trade-mark, would be to disregard its purpose and object, would be to sanction a fraud upon the public purchasing the article. We are of opinion, therefore, that the complainants

acquired no title to this trade-mark under the transfer from Land and his successors in business."

Eiseman v. Schiffer (C. C.) 157 Fed. 473, was a case in some respects like the present. It appears therefrom that the Gilbert Company first used the word "Radium," and acquired trade-mark rights in it, in respect of a class of silk goods. Thereafter it transferred to Eiseman Bros., subject to a certain agreement, all its right, title, and interest in the trade-mark, together with all its right, title, and interest in the good will of its business, in which the said trade-mark had been used. Notwithstanding this transfer, the Gilbert Company continued to conduct the business in which it had formerly used the mark exactly as before, except that it substituted the word "Electra" for "Radium" upon the same class of goods. Judge Lacombe in his opinion says, at page 476:

"At about the time of the execution of the instrument it turned over to Eiseman & Co. all goods in its possession marked 'Radium'; but it appears that after November 23, 1905, the Gilbert Company continued to conduct the business in which it has used the mark precisely as it had before, with the single exception that it affixed the mark 'Electra,' instead of 'Radium,' to the goods it sold. The evidence is persuasive to the conclusion that this is exactly what both parties intended; that neither of them contemplated that the business in which the mark had been used should be turned over by the company to the firm. But the statute contemplates that, whatever extensions of the trade-mark through extensions of business may subsequently be legitimately acquired by the assignee, he shall take over the good will of the business in which, prior to assignment, the trade-mark has been used. Both are to pass together. The trade-mark shall not be conveyed to one, and the particular business in which it was used remain with the other. That seems to be the policy of the statute, expressed in sufficiently plain terms, and it is unnecessary to discuss the question whether this provision is a mere statement of existing law or is a new departure. It is not contended that the original owner of the trade-mark shall go out of the dry goods business, nor that it shall cease to sell silk dress goods in the piece to which it has not appropriated the trade-mark. But, when a trader has sold some particular article under a selected name to such an extent as to secure registration, he has established a special business in which that trade-mark is used, and, if the trade-mark becomes so valuable as to induce him to sell it, he must, as a condition of transfer under the statute, assign that special business with the trade-mark of which it was the parent. Eiseman & Co., therefore, acquired no rights under the alleged assignment which did not carry the special business. The suggestion of hardship, in that by subsequent action the assignor has defeated the assignment for which it received a valuable consideration, is not persuasive. They have their remedy against the company, if the transfer was not in fact what they were given to understand it would be."

It is true that the last case was decided under the assignment law of 1905 (Act Feb. 20, 1905, c. 592, 33 Stat. 724 [U. S. Comp. St. Supp. 1909, p. 1275]); but, notwithstanding that fact, it is of great weight and highly illustrative, since the same general principle underlies this case that underlay that.

Again, in Macmahan Pharmacal Co. v. Denver Chemical Mfg. Co., 113 Fed. 468, at page 474, 51 C. C. A. 302, at page 308, the court said:

"The main purpose of the contract was to transfer from complainant company to Dr. Campbell the right to use the word 'Antiphlogistine' as a trade-mark for his preparation, which, by agreement, was not to be in 'liquid form.' There was no transfer to him of complainant's business, or any part of it, and no license to operate at complainant's place of business. The sole pur-

pose was to separate what complainant called its trade-mark, reserving to itself the right to use it on its preparation in liquid form, and transferring it to Dr. Campbell for his use on preparation not in liquid form. This contract betrays a false conception of the character of trade-mark property. A trademark cannot be assigned, or its use licensed, except as incidental to a transfer of the business or property in connection with which it has been used. An assignment or license without such a transfer is totally inconsistent with the theory upon which the value of a trade-mark depends and its appropriation by an individual is permitted."

The law in general in respect of assignments of trade-marks is laid down in Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769, in the following language:

"It is true the primary object of a trade-mark is to indicate by its meaning or association the origin of the article to which it is affixed. As distinct property, separate from the article created by the original producer or manufacturer, it may not be the subject of sale. But when the trade-mark is affixed to articles manufactured at a particular establishment, and acquires a special reputation in connection with the place of manufacture, and that establishment is transferred either by contract or operation of law to others, the right to the use of the trade-mark may be lawfully transferred with it. Its subsequent use by the person to whom the establishment is transferred is considered as only indicating that the goods to which it is affixed are manufactured at the same place and are of the same character as those to which the mark was attached by its original designer."

Multitudes of authorities of the same purport might be cited, were it necessary, which it is not, since they uniformly uphold the one general principle.

In dealing with this case it is assumed, although denied by defendant's counsel, that a person may legitimately own and use in his business several different trade-marks upon the same article; but it does not follow from this that a person having a dozen trade-marks can assign 11 of them to as many different people, authorizing each of them to manufacture and sell the identical article to which all the marks were originally applied under the particular one specially assigned to him, while at the same time the assignor can continue to manufacture and sell the self-same article at the same place of business and affix thereto the single remaining unassigned trade-mark. Such a wealth of trade-marks might be perfectly valid in the hands of one party while conducting a single business, and might continue to be valid in the hands of a third party when assigned with the good will and business with which they originated, but when scattered in the manner indicated would work nothing but confusion and fraud. The law of trade-marks has not been so broadly applied, and cannot be, in my judgment, without overruling its underlying and well-established principles. If a man can establish and then assign 4 or 5 trademarks, and still continue his original business unimpaired, he can, with almost equal facility, establish and assign 400 or 500. The ability to do this might constitute him a successful manufacturer of trademarks, and probably inure to his pecuniary benefit as a dealer therein; but the result could work only disaster to the public and legitimate trade-mark owners. But neither the good will of a business, nor the business itself, can be thus split up. I am persuaded that the use of decimal fractions will not be adopted for the purpose of determining

just how much or how little of the good will of a business, or of the business itself, must be transferred with a trade-mark, in order that its assignment should be valid. It is sufficient to say in this connection, however, that the assignor cannot, after the assignment, continue the same identical business and at the same places as before, under unassigned trade-marks, and at the same time authorize his assignee to conduct the same business elsewhere under an assigned trade-mark. In either case the same business would be conducted.

The only cases cited by complainant's counsel which at all seem to indicate that trade-marks may be separated from the business with which they are identified are Filkins v. Blackman, 13 Blatchf. 440, Fed. Cas. No. 4,786, and Congress Spring Co. v. High Rock Spring Co., 45 N. Y. 291, 6 Am. Rep. 82, in each of which substantially the following language appears:

"The property or right to a trade-mark may pass by an assignment or by operation of law to any one who takes at the same time the right to manufacture or sell the particular merchandise to which said trade-mark has been attached."

This language, however, lends little support to the proposition, since, upon examination of the cases, it appears that in each of them the entire business in connection with which the trade-mark had been acquired passed by the assignment. In the case at bar neither the business nor the good will passed by the assignment within the meaning of the cases. It is in the nature of a license, rather than an absolute transfer. In effect, Sherman Bros. & Co. said to their assignee: You can have one of our trade-marks, and manufacture and sell alum baking powder thereunder; but we will keep our other trade-marks applicable to the same product, and continue its manufacture as before. That is to say, they dealt with the matter as if they were possessed of a patent under which they were at liberty to license upon their own terms as many persons as they pleased. Under the circumstances appearing in the record, no trade-mark rights passed from Sherman Bros. & Co. to Engler.

But even if the assignment in this case were sufficient to pass whatever trade-mark rights Sherman Bros. & Co. had in the word "Solar," it is further contended on behalf of the defendant that such rights were subsequently lost when the complainant, as appears by the evidence, changed the formula of the baking powder under which Sherman Bros. & Co. acquired their rights by substituting phosphate for alum as an ingredient. It appears that alum, phosphate, or cream of tartar, as the case may be, constitutes the acid ingredient of a baking powder. The function of such ingredient is to combine chemically with the soda and liberate the gas therefrom. Notwithstanding the acid ingredient of whatever kind has but the one function, it nevertheless gives both character and name to its product. Baking powders are very generally advertised as belonging to one class or the other, and much ado is made of the fact that alum, or phosphate, or cream of tartar, as the case may be, is or is not an ingredient of a particular baking powder. Keeping in mind, then, that whatever rights Engler acquired from Sherman Bros. & Co. in the use of the word "Solar"

as a trade-mark, and subsequently transferred to the complainant, were originated and identified strictly with an alum powder, it will be seen that the question under consideration is serious. In my judgment the substitution of one important ingredient for another, in the manner it was admittedly done in this case, worked a forfeiture of whatever trade-mark rights the complainant otherwise would have had in the word "Solar." There is no gainsaying the fact that such rights were acquired in connection with an alum powder. A phosphate powder is a different powder, and whether better or worse than a cream of tartar or an alum powder is wholly immaterial.

Counsel for the complainant argues that the substitution in question resulted in an improved baking powder; but that is not the point. It resulted in the production of a different powder made under a materially different formula. The difference in the product is so great that it is recognized alike by manufacturers, traders, and the public. The record shows that great stress is laid upon the composition of a baking powder. Manufacturers of the different kinds are in constant and heated rivalry as to which is the best. A trade-mark established in connection with one article cannot be transferred at will to another. The trade-mark in question was not acquired in connection with baking powder in general, but with baking powder of a particular kind, apart from which its use is unjustifiable.

In Filkins v. Blackman, supra, a case cited by both parties, the court, in speaking of the trade-mark then in question, said:

"The name as a whole was his trade-mark, which he had the exclusive right to use, and the exclusive use of which would pass by assignment to any one who had lawfully obtained from the inventor the exclusive right also to manufacture and sell, and who did sell that particular article compounded according to the original formula. * * * The right to the use of a trade-mark cannot be so enjoyed by an assignee that he shall have the right to affix the mark to goods differing in character or species from the article to which it was originally attached."

Again, the testimony of a member of the firm of Sherman Bros. & Co. shows that the word "Solar," although attached to and used in connection with an alum baking powder nevertheless was intended to, and did, represent grade or price, rather than origin and ownership. From his testimony the following passages are extracted:

"The value of having several brands of baking powder consisted in being able to meet competition with one brand without destroying the profit on another brand which had more or less footing."

And again, concerning two of the brands, known as "Rocket" and "Solar," he testified as follows:

"Q. Now, in 1899, at what relative prices did you sell the 'Rocket' and 'Solar'? A. We sold the 'Rocket' the cheapest. Q. What was the comparative selling prices of the two, 'Rocket' and 'Solar'? A. We had a fixed price on 'Rocket' from 72 cents per dozen, f. o. b. Chicago, and our price varied on 'Solar' according to competition."

There was no fixed difference between the two brands. And again, speaking of "Solar," he said:

"It was one of the brands with which we meet competition."

This testimony came from the mouth of one of the originators of the trade-mark in suit. With such evidence, and more of the same character, which might be added, can it fairly be held that "Solar" was adopted for genuine trade-mark purposes? Was it intended primarily to indicate origin and ownership, or were the different trade-marks which were used in connection with the same powder adopted chiefly as a ready and efficient way of meeting competition in the prices of baking powder? Moreover, the somewhat inconstant, occasional, and relatively local use of the trade-mark in suit corroborates the testimony of the witness. The symbol "Solar" was adopted to meet trade competition. When competition was keen, "Solar," although of equal value with "Rocket" or any of the other brands ordinarily used upon alum powder, was put forward, and as a rule made to stand a cut in prices; but, where there was little or no competition, powder bearing one of the other brands was sold. This procedure certainly was not altogether fair and open. It was deceptive to the trade and the public, and in my judgment is condemned by the trade-mark law, and should not be countenanced by a court of equity. The symbol thus used did not honestly fulfill, and was not intended to fulfill, the primary object of a trade-mark.

As already stated, many other objections have been urged, but will not be considered, since, for the reasons hereinabove given, the bill of complaint should be dismissed, with costs.