**PEPSICO, INC., Appellant,**

v.

**The GRAPETTE COMPANY, Inc., and
Grapette-Aristocrat, Inc., Appellees.**

**No. 19464.**

United States Court of Appeals
Eighth Circuit.

Sept. 30, 1969.

Milton Handler, of Kaye, Scholer, Fier-
man, Hays & Handler, New York City,
for appellant; Fred A. Freund, Sidney
A. Diamond and Elizabeth Head, New
York City and Emon A. Mahony, of Ma-
hony & Yocum, El Dorado, Ark., on the
briefs.

J. W. Gipple, of Stevens, Davis, Miller
& Mosher, Washington, D. C., for ap-
pellees; Robert D. Klages, Washington,
D. C., and Walter H. Laney, Jr., Camden,
Ark., on the brief.

Before BLACKMUN, LAY and HEANEY, Circuit Judges.

LAY, Circuit Judge.

PepsiCo, Inc., a holding company of several subsidiaries including Pepsi Cola Co., a national soft drink bottler, sought an injunction against Grapette-Aristocrat, Inc. and its holding company Grapette Co. (hereinafter referred collectively as Grapette) on the alleged infringement of its trademark "Pepsi." In 1965 Grapette purchased the mark "Peppy" and intended to bottle a soft "pepper" drink with that name. The district court found that the mark "Peppy" was confusingly similar to "Pepsi" and as such would constitute infringement under 15 U.S.C. § 1114 (1964). However, notwithstanding this finding of infringement, the court denied the plaintiff injunctive relief on the ground that it was guilty of laches. 288 F.Supp. at 937. PepsiCo, Inc. appeals. We reverse.

The evidence shows that Pepsi Cola Co. has bottled beverages duly registered under trademarks "Pepsi Cola," "Pepsi" and "Pep-Kola" for many years. See 15 U.S.C. § 1065. Grapette is a national bottler and distributor of soft drinks, concentrates and syrups. In 1965 it developed a formula for a new syrup to be used in a pepper type bottled beverage as opposed to a cola beverage. In searching for a name to market the new product, defendant discovered the 1926 registration of the mark "Peppy" by H. Fox and Co., a partnership. The mark had been renewed by Fox in 1946 and 1966.[1] Sometime between 1932 and 1937 Fox began to use the mark "Peppy" in conjunction with a cola flavored syrup which was distributed on a local basis, confined mostly to the Eastern states of New York, New Jersey and Connecticut.[2] The cola distribution was sold exclusively as syrup. Since 1958, Fox's syrup has been sold only to jobbers in 28 ounce consumer size bottles. Some ten to twelve years prior to this time it was sold also to the fountain trade as a syrup in gallon containers.

In 1965, Grapette Co. entered into an agreement with Fox Corp. in which the trademark "Peppy" was assigned to defendant for a consideration of $7,500. At this time Fox Corp. was in a Chapter 11 bankruptcy proceeding.[3] Although Fox Corp. made a formal assignment of "good-will", it is conceded by defendant that none of Fox Corp.'s physical assets or plant were transferred with the trademark; no inventory, customer lists, formulas, etc. Upon acquisition of the "Peppy" mark, Grapette began arrangements to have this mark placed upon its new pepper flavored soft drink. Fox Corp. continued to sell its cola syrup under the mark "Fox Brand" as well as agreeing to act as a distributor of defendant's "Peppy." In 1965, plaintiff warned the defendant of possible litigation if it did not stop the use of its mark. On April 21, 1966, this action was begun.

Plaintiff contends (1) that the transfer of the trade-mark "Peppy" by Fox Corp. was invalid because it was an assignment in "gross" and that therefore, Grapette cannot stand in the shoes of its predecessor in order to assert the defense of laches; and (2) that the defense of laches is not supported by sufficient evidence.

It is not disputed that Grapette must stand in the place of Fox Corp. Without a valid assignment, Grapette's rights to the use of "Peppy" accrue only as of

1. The partnership transferred the mark to H. Fox and Co., Inc., a corporation, in 1965 (hereinafter called Fox Corp.). The validity of this transfer is also attacked by plaintiff but in view of our holding we do not pass upon this contention.

2. Fox originally used the name on a "ginger-bitter" syrup and then later on a grape punch.

3. Plaintiff also attacks the validity of the assignment from Fox Corp. to Grapette on the ground that the transfer was done without approval of the bankruptcy court. Since we find the assignment invalid in any event, it is not necessary to pass upon this contention.

November 1965 and it could not assert the defense of laches. PepsiCo, Inc. asserts that the 1965 assignment of the trademark by Fox Corp. to Grapette was a legal nullity in that the trade-mark was transferred totally disconnected from any business or goodwill of the assignor. We must agree.

Section 1060 of the Lanham Act provides:

"A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark, and in any such assignment it shall not be necessary to include the goodwill of the business connected with the use of and symbolized by any other mark used in the business or by the name or style under which the business is conducted. * * *" 15 U.S.C. § 1060.

The early common law rule that a trademark could not be assigned "in gross" was recognized in this circuit in Macmahan Pharmacal Co. v. Denver Chem. Mfg. Co., 113 F. 468 (8 Cir. 1901) and in Carroll v. Duluth Superior Milling Co., 232 F. 675 (8 Cir. 1916). This court in *Carroll* observed that a trademark could only be transferred "in connection with the assignment of the particular business in which it has been used, with its good will, and for continued use upon the same articles or class of articles." *Id.* at 680. We later explained "that there is no property in a trade-mark except as a right appurtenant to an established business or trade, when it becomes an element of good will." Atlas Beverage Co. v. Minneapolis Brewing Co., 113 F.2d 672, 674–675 (8 Cir. 1940). The rule found derivation in Kidd v. Johnson, 100 U.S. 617, 25 L.Ed. 769 (1879). The necessity to assign more than the naked mark was premised upon the primary object of the trademark "to indicate by its meaning or association the *origin* of the article to which it is affixed." (Emphasis ours.) 100 U.S. at

620, 25 L.Ed. 769. This court recently observed in Sweetarts v. Sunline, Inc., 380 F.2d 923, 926 (8 Cir. 1967): "A trademark is generally any name, sign, or mark which one adopts to denominate commercial goods originating from him."

As pointed out in the Restatement (Second) of Torts, § 756, comment *a* at 136 (Tent. Draft No. 8, 1963):

"A trademark or tradename is not itself an independent object of property, nor is the right to use such mark or name. The designation is only a means of identifying particular goods, services, or a business associated with a particular commercial source, whether known or anonymous. * * * Goodwill is property, and since it is transferable the symbol of the property is transferable along with it."

Strict adherence to this rule has been vigorously criticized as impractical and legalistic. Schecter, The Rational Bases of Trademark Protection, 40 Harv.L.Rev. 813 (1926); Grismore, The Assignment of Trademarks and Tradenames, 30 Mich. L.Rev. 489 (1932); Callman, Unfair Competition, Trademarks and Monopolies, § 78 (3d ed. 1969); Note, Trademark Protection Following Ineffective Assignment, 88 Pa.L.Rev. 863 (1940). According to these commentators, the continuum of the rule fails to comprehend the modern image of the trademark to the consuming public. Strict application of the rule undoubtedly fails to recognize the function of the trademark as representing as well (1) a guaranty of the product and (2) the inherent advertising value of the mark itself. *Id.*

Some recent cases have given recognition that in certain situations a naked assignment might be approved. Grapette emphasizes the case of Hy-Cross Hatchery, Inc. v. Osborne, 303 F.2d 947, 49 CCPA 1163 (1962), as being controlling.

There the plaintiff sought cancellation of the trademark "Hy-Cross" solely on the basis that the assignee of the original registrant took nothing but the naked mark. The evidence showed that all the assignee received was the mark

itself. Osborne, the assignor, did not continue in the same business of raising chickens. The court in discussing the issue of naked assignment stated the following:

"Unlike the cases relied on, Osborne, so far as the record shows, was using the mark at the time he executed the assignment of it. He had a valid registration which he also assigned. With these two legal properties he also assigned, in the very words of the statute, 'that part of the goodwill of the business connected with the use of and symbolized by the mark * * *.' He was selling chicks which his advertising of record shows were designated as 'No. 111 HY-CROSS (Trade Mark) AMERICAN WHITES.' As part of his assignment, by assigning the goodwill, he gave up the right to sell 'HY-CROSS' chicks. This had been a part of his 'business.' By the assignment Welp, the assignee, acquired that right. The record shows that he began selling 'HY-CROSS Hatching Eggs' and chicks designated as 'HY-CROSS 501,' 'HY-CROSS 610,' and 'HY-CROSS 656.' Thus, what had once been Osborne's business in 'HY-CROSS' chicks became Welp's business. We do not see what legal difference it would have made if a crate of eggs had been included in the assignment, or a flock of chickens destined to be eaten.

"As for the argument that the transfer should have been held illegal because Osborne sold one kind of chick and Welp sold another another [sic] under the mark, whereby the public would be deceived, we think the record does not support this. The *type* of chick appears to have been otherwise indicated than by the trademark, as by the numbers above quoted as well as by name. Osborne, moreover, was not under any obligation to the public not to change the breed of chicks he sold under the mark from time to time."

In the instant case we need not decide whether the strict common law rule must apply or whether the approach, as suggested by *Hy-Cross,* should prevail. Inherent in the rules involving the assignment of a trademark is the recognition of protection against consumer deception. Basic to this concept is the proposition that any assignment of a trademark and its goodwill (with or without tangibles or intangibles assigned) requires the mark itself be used by the assignee on a product having substantially the same characteristics. See e. g., Independent Baking Powder Co. v. Boorman, 175 F. 448 (C.C.D.N.J.1910) (alum baking powder is distinctive from phosphate baking powder); Atlas Beverage Co. v. Minneapolis Brewing Co., 113 F.2d 672 (8 Cir. 1940) (whiskey is a different product than beer); H. H. Scott, Inc. v. Annapolis Electroacoustic Corp., 195 F.Supp. 208 (D.Md.1961) (audio reproduction equipment is distinctive from hi-fidelity consoles). Cf. W. T. Wagner's Sons Co. v. Orange Snap Co., 18 F.2d 554 (5 Cir. 1927) (No infringement: gingerale is in a different class than fruit flavored soft drinks).

Historically, this requirement is founded in the early case of Filkins v. Blackman, 9 Fed.Cas. 50 (No. 4786) (C.C.D.Conn.1876), wherein the court observed:

"If the assignee should make a different article, he would not derive, by purchase from Jonas Blackman, a right which a court of equity would enforce, to use the name which the inventor had given to his own article, because such a use of the name would deceive the public. The right to the use of a trade-mark cannot be so enjoyed by an assignee that he shall have the right to affix the mark to goods differing in character or species from the article to which it was originally attached." *Id.* at 52.

The philosophy of the rule is sound even though *the pragmatic utility of it* is sometimes difficult and confusing. Grapette urges that it intends to use the trademark "Peppy" on a product of the same general "classification" as Fox, its assignor. "Class" of product may mean

one thing for registration purposes, have a completely different connotation in trademark infringement cases, and yet have a distinctive meaning when considering use upon assignments. The meaning of "class" in infringement cases tends to be more inclusive. There "class" may be broadly defined as:

> " '[T]he word class * * * means broadly a genus including as species any goods upon which the use of the same mark, when the goods are exposed side by side, would tend to mislead the purchasing public.' " E-Z Waist Co. v. Reliance Mfg. Co., 52 App. D.C. 291, 286 F. 461, 462 (1923).

■ Contrary to appellee's contention, the classes set up under the federal statutes to simplify registration, are not controlling. Rock Spring Distilling Co. v. W. A. Gaines & Co., 246 U.S. 312, 320, 38 S.Ct. 327, 62 L.Ed. 738 (1918). See also 1 Nims, Unfair Competition & Trademarks, 694–695 (4 ed. 1947). Thus, the fact that defendant's "Peppy," and Fox's "Peppy" are registered in Class 45 (soft drinks and carbonated waters, and nonalcoholic maltless beverage and syrup respectively) cannot mean that these products are within the same "class" in determining the validity of the assignment to defendant Grapette.

■ The ultimate concern in all cases is the welfare of the public. A case by case treatment of the problem as specific facts present themselves is desirable. Although dealing with the broad, general "class" to test infringement, the case of W. T. Wagner's Sons Co. v. Orange Snap Co., 18 F.2d 554 (5 Cir. 1927), serves as a useful analogue to the facts presented here. There, both the plaintiff and defendant used the trademark "Snap" on their ginger ale and fruit flavored beverages respectively. Although both were

included within Class 45 for purposes of registration, the court observed:

> "The evidence did not show that appellee's above-mentioned beverages possessed substantially the same descriptive qualities as are possessed by appellant's ginger ale, or any other ginger ale or beverage of the same general class. Appellee's Orange Snap and Lemon Snap are fruit beverages. Ginger ale is not a fruit beverage, and is not a beverage of substantially the same descriptive properties as those of fruit beverages. For two beverages to be of the same general class, it is not enough that each of them is nonalcoholic and contains a principal ingredient derived from a plant, however different the plants may be." *Id.* at 555.

See also Rock Spring Distilling Co. v. W. A. Gaines & Co., supra; Independent Baking Powder Co. v. Boorman, 175 F. 448 (C.C.D.N.J. 1910).

■ Where a transferred trademark is to be used on a new and different product, any goodwill which the mark itself might represent cannot legally be assigned. "The trademark owner does not have the right to a particular word but to the use of the word as the symbol of particular goods." Callman, § 78.1(a) at 426. To hold otherwise would be to condone public deceit. The consumer might buy a product thinking it to be of one quality or having certain characteristics and could find it only too late to be another. To say that this would be remedied by the public soon losing faith in the product fails to give the consumer the protection it initially deserves.

■ It is here that Grapette's use of the mark "Peppy" meets terminal difficulty. Grapette's intended use of the mark is one to simply describe its new pepper beverage.[4] The evidence is clear

---

4. Mr. Fooks, Chairman of the Board of Grapette, testified:
   "We went into his [Mr. Fox's] office and I told him just frankly my situation, that I had this product ready for the market with no name and I thought his name was a very suitable name, and if it wasn't too valuable I would like to purchase it." Record at 176a–177a.

that Grapette did not intend to adopt or exploit any "goodwill" from the name "Peppy" and Fox's long association and use of it *with a cola syrup.* When one considers that Grapette did not acquire any of the assets of Fox, did not acquire any formula or process by which the Fox syrup was made, cf. Mulhens & Kropff, Inc. v. Ferd Muelhens, Inc., 38 F.2d 287 (D.C. 1929), rev'd 43 F.2d 937 (2 Cir. 1930), mandate clarified 48 F.2d 206 (2 Cir. 1931), and then changed the type of beverage altogether, the assignment on its face must be considered void. It seems fundamental that either the defendant did not acquire any "goodwill" as required by law or if it did, assuming as defendant argues the mark itself possesses *"goodwill,"* by use of the mark on a totally different product, Grapette intended to deceive the public. Either ground is untenable to the validity of the assignment.

We hold that the assignment to Grapette of the trademark "Peppy" is void and that Grapette possesses no standing to raise the equitable defense of laches.

Judgment reversed and remanded for further relief to be determined by the district court.

BLACKMUN, Circuit Judge (concurring).

I concur, but on the ground that Hy-Cross Hatchery, Inc. v. Osborne, 303 F. 2d 947, 49 CCPA 1163 (1962), the case relied upon by the district court here, is not, or should not be helpful authority for Grapette. *Hy-Cross* is a peculiar case factually in that, among other aspects, live baby chicks were the product of both assignor and assignee. The court did place some reliance on what it seemed to regard as a genuine transfer of goodwill, 303 F.2d at 950, and, accordingly, saw little legal significance in the absence of an assignment of tangible chicks themselves. See J. C. Hall Co. v. Hallmark Cards, Inc., 340 F.2d 960, 963, 52 CCPA 981 (1965), where the same court apparently relates the significance of

*Hy-Cross* to the absence of a transfer of tangible assets.

But if, as Grapette urges, the Hy-Cross holding has greater import than its peculiar facts suggest for me, then I would regard it as aberrational to settled authority. I prefer to stay with the usual rule, long established I thought, that a trademark may not validly be assigned in gross. And product difference is only an aspect of this traditional rule. A naked assignment is all that Fox and Grapette attempted and effected. It is not enough.