George C. SULLIVAN, an individual, and Ling-Temco-Vought, Inc., a corporation, Plaintiffs,

v.

SEARS, ROEBUCK & CO., a corporation, Defendant,

and

Dartmouth Skis, Inc., a corporation, Defendant-Intervenor.

DARTMOUTH SKIS, INC., a corporation, Plaintiff,

v.

LING–TEMCO–VOUGHT, INC., a corporation of Delaware, and George C. Sullivan, an individual, Defendants.

Civ. A. Nos. 42070, 42551.

United States District Court.
N. D. California.

Aug. 29, 1967.

Harry G. Weissenberger, of Mellin, Hanscom & Hursh, San Francisco, Cal., and Porter & Meyer, Boston, Mass., for plaintiffs.

Naylor & Neal, Jas. M. Naylor, Frank A. Neal, San Francisco, Cal., for defendant Sears, Roebuck & Co., and plaintiff Dartmouth Skis, Inc.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

LLOYD H. BURKE, District Judge.

1. The plaintiff George C. Sullivan is a citizen of the United States of America, and a resident of Hollywood, County of Los Angeles, State of California, and the plaintiff Ling-Temco-Vought, Inc. is a corporation of Delaware, with its principal place of business at Dallas, County of Dallas, State of Texas, and has subjected itself to the jurisdiction of this court by joining as plaintiff in the action No. 42,070 herein.

2. Defendant, Sears, Roebuck & Co. is a corporation duly organized and existing under the laws of the State of New York, and has a regular and es-

tablished place of business at San Francisco, California, and defendant Dartmouth Skis, Inc. is a corporation organized and existing under the laws of the State of New Hampshire, and has a principal place of business at Lebanon Street, Hanover, New Hampshire.

3. Civil Action No. 42,070 is a suit for infringement of patent No. 2,525,618, granted October 10, 1950 to Wayne M. Pierce, Jr. for Ski of Laminated Construction, brought by George C. Sullivan Plaintiff, of Hollywood, California, as owner of the Pierce patent, against Sears, Roebuck & Co. Defendant here has counterclaimed for a Declaratory Judgment of invalidity and non-infringement against the Pierce patent. This suit is openly defended by Dartmouth Skis, Inc. of Hanover, New Hampshire, a corporation of New Hampshire, as to Skis sold to Sears, Roebuck & Co. by Dartmouth Skis, Inc. It is defended separately by Sears, Roebuck by the same counsel as to certain German Voestra Skis bought independently by Sears, Roebuck & Co.

4. Civil Action No. 42,551 is a suit for Declaratory Judgment of Invalidity and Non-Infringement against the same Pierce patent No. 2,525,618 brought by Dartmouth Skis, Inc. against Ling-Temco-Vought, Inc. of Dallas, Texas, a corporation of Delaware, as owner of the patent in suit. The suit was brought in the District of Massachusetts where the defendant had a regular and established place of business. The suit was ordered transferred to the United States District Court for the Northern District of California, Southern Division, by the District Court of Massachusetts, and the two suits have been consolidated for trial by stipulation of counsel. Ling-Temco-Vought, Inc. has been added as a party plaintiff in Civil Action No. 42,070, and George C. Sullivan has been added as a party defendant in Civil Action No. 42,-551, by appropriate amendments to pleadings.

5. Since both actions have been consolidated for trial, and have been tried as one suit for patent infringement, for simplicity and to prevent confusion, counsel have treated George C. Sullivan and Ling-Temco-Vought, Inc. as plaintiffs, and Dartmouth Skis, Inc. and Sears, Roebuck & Co. as defendants in the consolidated action. Dartmouth Skis, Inc. is not a named defendant in Civil Action No. 42,070. But since it is openly defending on behalf of defendant Sears, Roebuck & Co., Dartmouth Skis, Inc. has become a named defendant by stipulation in Civil Action No. 42,070.

6. The Jurisdiction of the Court is based on the Patent Laws of the United States Title 35 and Title 28 U.S.C. Sec. 1338, and the Declaratory Judgment Act, Title 28 U.S.C. Sec. 2201.

7. Plaintiffs have brought suit on claims 7, 10, 11 and 12 of the Pierce patent No. 2,525,618. The Skis sold by Dartmouth Skis, Inc. to Sears, Roebuck & Co. and alleged to infringe claims 7, 10, 11 and 12 of the Pierce patent are certain Wood and Metal Skis made by Skifabrik Josef Fischer of Ried-im-Innkreis, Austria. Certain other Wood and Metal Skis made by Skifabrik Anton Kastle of Hohenems, Austria and sold by Dartmouth Skis, Inc. were originally alleged to infringe the Pierce patent. But by a Partial Consent Judgment entered herein by stipulation of counsel, it has been agreed that no Wood and Metal Skis made by Kastle Skifabrik infringe the Pierce patent. Also certain Japanese Wood and Metal Skis imported by Dartmouth Skis, Inc. and certain Voestra Skis imported by Sears, Roebuck & Co. are alleged to infringe the Pierce patent.

8. The Complaint in Civil Action No. 42,551 sets up the controversy relating to Kastle Skis, Par. 4 and 5. However, some seven months after bringing suit the plaintiff Sullivan withdrew his charge of infringement by the Kastle Skis, in a move to prevent transfer of the first suit to the United States District Court in Massachusetts and entered into a Consent Partial Summary Judgment on August 4, 1964 that no Kastle Skis infringed the Pierce patent. Plaintiffs' Exhibits 6 and 8 are typical of the Kastle

Skis covered by the Consent Summary Judgment.

9. Defendants do not dispute title to the Pierce patent. It is owned by Plaintiff, George C. Sullivan, with certain license rights being retained by Ling-Temco-Vought, Inc., as shown by the evidence of record herein. The patent has passed through a chain of title from United Aircraft Corporation of Hartford, Connecticut, through several Chance-Vought Companies, to the Plaintiff, Ling-Temco-Vought, Inc., and thence to the Plaintiff, George C. Sullivan.

10. Defendants deny infringement of Claims 7, 10, 11 and 12 of the Pierce patent, for the following reasons:

a) The Ski of the Pierce patent has never been manufactured commercially by any of the owners of the Pierce patent. Even the patentee, Wayne M. Pierce, Jr., has never manufactured Skis under his own Pierce patent, although he manufactured Metal Skis, the Alu Sixty, and the Truflex for a number of years, while doing business as Tey Manufacturing Co. of Milford, Connecticut.

b) Pierce's claims 7, 10, 11 and 12 must be narrowly construed in the light of Pierce's specifications.

c) Because of Collateral Estoppel the Plaintiff, Sullivan, has entered a Consent Summary Judgment herein that no Kastle Skis, manufactured and sold by Skifabrik Anton Kastle of Hohenems, Austria, infringe any claims of the Pierce patent. But Defendants' skis charged to infringe herein are in all significant and material respects indistinguishable from the Kastle Skis agreed not to infringe. If Kastle Skis do not infringe, neither do Defendants'.

11. The defendants contend that claims 7, 10, 11 and 12 of the Pierce patent in suit are invalid for the following reasons:

a) Under 35 U.S.C. Secs. 101, 102 and 103 in view of the prior art; and more particularly in view of

b) Chance-Vought's Metalite material —a structural laminated Wood and Metal Structural Material developed, manufactured, used and sold for airplanes, which comprises a laminated balsa wood core, preferably edge-grain, and covered on top and bottom with a sheet of aluminum alloy. Pierce used this Metalite process and material for making his Ski of Laminated Construction of the Pierce patent in suit. Pierce selected the Metalite material for his Ski, because of its known qualities of high strength, light weight and flexibility. Plaintiffs' patent expert Mr. Robertson agrees that claim 7 defines no more than "A metalite Ski." Substituting "structure" for "ski", claim 7 reads directly on the Metalite material.

c) Under 35 U.S.C. Sec. 112 for Indefiniteness, in that the essential limitations in claim 7 are defined in terms such as "relatively thick", "thin metal" and "harder material". In claims 10, 11 and 12 the terms such as "substantial thickness", "lesser thickness" and "wider than" are contrary to the requirement of Section 112.

d) The Claims in suit do not claim a true combination of elements, but merely an aggregation of elements sold in the art, each performing its own individual function.

12. Claims 10, 11 and 12 of the patent in suit differ from claim 7 in that the focal point of novelty in claims 10, 11 and 12 lies in the provision of beveled side edges on the laminated ski whereby a file drawn along said beveled side edge will sharpen the steel edges of the ski. Claim 10 is typical:

"A laminated ski having a central core sheet of substantial thickness and metal facing sheets of lesser thickness adhesively secured to said core sheet on the upper and lower faces thereof, the bottom facing sheet being wider than the top facing sheet and the exposed sides of said core sheet being beveled between the edges of said metal sheets."

The testimony in the case was that it was common practice to offset the steel edges of Skis and to use a file to sharpen the metal edges.

(a) The accused laminated skis sold by Dartmouth Skis, Inc. and Sears, Roebuck & Co. of which the Fischer Alu Combi Ski (Plfs. Exh. 1, 7 and 10), the Fischer Wedel King (Plfs. Exh. 2) the Sears' Standard 400 (Plfs. Exh. 3), the Dartmouth Skimeister (Plfs. Exh. 4), the Voestra Ski sold by Sears, Roebuck (Plfs. Exh. 5), and Fischer Alu President (Plfs. Exh. 9) are representative and do not have beveled side edges in the sense and for the sharpening purpose of the structures defined in Pierce claims 10, 11 and 12. The Fischer Alu ski is narrow at the top and wider at the bottom, with vertical side walls defining these relative dimensions and includes an intermediate bevel at the point of intersection of the two aspects of the vertical side walls. The Fischer bevel is, however, more ornamental than functional and remote from the steel edge that would require sharpening from time to time.

13. The plaintiffs contend that the Pierce patent in suit revolutionized the Ski Industry, being responsible for the great present day popularity of Metal Skis. Plaintiffs' Ski expert, Mr. Scott, testified (Rp. 267–278):

"A There are literally dozens and dozens of metal skis on the market today. I would say the number is well over 50. To my knowledge they are similar to Pierce in every respect—

Q Say if they have the elements.

A To my knowledge they have all of the elements you mentioned, except one, and I think that they have that, but I can't state it because I haven't sawed apart the tips and tails, the end caps. Everything else is obvious on the cross sections shown on the counters of ski shops and that you can see from the outside of the ski. You can assume that they are adhesively bonded because there are no rivets or screws or nails or bolts obvious.

The one thing I can't testify on is in the caps because I have only seen these few sawn apart.

So many new makes have come in since I stopped repairing skis that I can't say that I have seen them damaged and broken open."

14. In view of Plaintiffs' contentions as to the effect of the Pierce patent on revolutionizing the Ski Industry, and the breadth and scope of the Pierce patent, it is important to determine precisely what the Pierce patent discloses and claims. The title of the Pierce patent is "Ski of Laminated Construction". The Pierce patent makes it clear that the growing scarcity of hickory and other woods of requisite quality for making Wooden Skis led to the development of his Metal Ski. Pierce discloses a ski having a wooden core of vertically laminated construction, adhesively secured together, and upper and lower facing sheets of aluminum. Pierce specifically discloses:

a wooden core sheet 10 formed of adhesively-connected *sections 18 of edge-grain balsa wood,*

upper and lower facing sheets 12 and 14, preferably of hard aluminum alloy, adhesively secured to the upper and lower faces of the wooden core sheet 10,

side strips 20 and 22 "of harder material", (hard wood such as maple, or a phenolic resin material),

heel and toe caps 24 and 26, "preferably of the same hard material".

The entire disclosure as to beveled edges (claims 10, 11 and 12) is thus stated (col. 3, l. 56–71):

"In Fig. 5 a modified construction has been shown in which the bottom facing sheet 44 is wider than the top facing sheet 46 and the outer edges of the side strips 48 and 50 are accordingly *beveled inwardly and upwardly at an angle of approximately 10°.* This provides sharp lower edges which can be resharpened by filing as is sometimes done in racing to obtain increased grip in performing fast maneuvers."

The following features are disclosed, but are not involved in any claims in suit:

- a longitudinal flute or groove 28 formed in the lower aluminum facing sheet,
- a slot or channel 32 cut in the wooden core sheet 10 into which the flute 28 projects,
- a foot pad 16 of suitable wood, such as mahogany, for attaching the Ski Binding to the ski.

15. The following structure disclosed in the Pierce patent and claims is not involved in the present suit:

1. The wooden core 10 comprising vertical sections (edge-grain balsa wood) and upper and lower metal facing sheets adhesively secured together (claims 1, 2, 3, 4, 6, 14, 17 and 18), which is the basic material of the Pierce ski.

2. The foot plate 16 secured to the top aluminum facing sheet 12 (claims 3, 4, 6, 8, 14 and 15).

3. The V-shaped lower metal facing sheet 52 with its apex 54, shown in the modification, Fig. 6, (claim 13).

4. The longitudinal slot or channel 32 cut in the wooden core 10 providing latterally spaced strips of core material, and the longitudinal flute or groove 28 extending into the space between the strips of core material (claims 5 and 16).

None of the Defendants' Skis involved in this suit have these features.

16. The only claims left, and which are charged to be infringed in this suit, are claims 7, 10, 11 and 12.

Claim 7 is limited to a core sheet, heel and toe caps of harder material, side strips of harder material, and facing sheets of thin metal overlying the core sheet, and reads as follows:

"7. A laminated ski including a relatively thick core sheet,

having caps of harder material forming extensions thereof at opposite ends, and having strips of harder material extending between said caps along the sides of said sheet,

adhesive means for securing said strips and caps to said sheet for framing the edges of said sheet,

and facing sheets of thin metal overlying said core sheet and adhesively secured thereto and to said strips and caps."

The function of the strips and caps as disclosed in the Pierce patent is summarized by Pierce thus (col. 2, lines 32–35):

"The light, cellular balsa wood sections are thus *enclosed on all sides* by the harder, more wear resisting material of the side strips and end caps."

In his deposition Pierce summarized the function of the toe and heel caps by stating that their purpose was "to protect the ends of the ski from damage when they hit any object or were mistreated." (Pierce Depn. p. 25). As to the side strips, Pierce said (Depn. p. 22):

"A. If it didn't have the side strips, it would bend the bottom and then the ski down on the edge, bend the aluminum up into the balsa, the balsa construction.

Q. I take it that it probably protects the balsa or wooden core and probably makes it waterproof?

A. Probably, yes."

17. Claims 10, 11 and 12 are limited to a central core sheet, metal facing sheets secured to the upper and lower faces of the core sheet, with the bottom metal facing sheet being wider than the top facing sheet, and the exposed sides of the core sheet between the facing sheets being beveled (as shown in the modification in Fig. 5). *The side strips 22 and 24 are not claimed as an element in these claims.* Of these claims, claim 10 can be taken as typical and reads as follows:

"10. A laminated ski having a central core sheet of substantial thickness,

and metal facing sheets of lesser thickness adhesively secured to said core sheet on the upper and lower faces thereof,

the bottom facing sheet being wider than the top facing sheet,

and the exposed sides of said core sheet being beveled between the edges of said metal sheets."

Claims 11 and 12 are of similar nature, with varying language. The purpose of the beveled sides, as Pierce stated in his patent (col. 3, lines 55–64):

"This provides sharp lower edges which can be resharpened by filing, as is sometimes done in racing to obtain increased grip in performing fast maneuvers."

18. The alleged novel features of the Pierce patent, which Plaintiffs contend "revolutionized" the Ski Industry and led to the introduction and popularity of the Metal Ski are seen to consist of details of structure, such as Heel and Toe Caps, added for protection of the soft wooden balsa wood core, and Side Strips of phenolic or hard wood, added to enclose the soft wooden core and protect it from moisture (Claim 7), and beveled sides, provided to make it easier to sharpen the edges of the lower aluminum facing sheet (Claims 10, 11 and 12).

19. The features of the hard steel edge, the plastic running surface, which are understood to be added to practically all Metal Skis sold today, and which are shown in the Defendants' Skis charged to infringe herein (Plfs. Exhs. 1 to 10), are not disclosed in the Pierce patent at all, and are not as such involved in this suit. Nevertheless, the steel edges in Defendants' Skis charged to infringe present the problem to the Plaintiffs, whether the steel edges are, or are not, to be considered as part of the "bottom metal facing sheet" in Claims 7, 10, 11 and 12. In the Kastle Ski the steel edges are not regarded as part of the bottom metal facing sheet, to avoid infringement. But in Defendants' Skis, specifically the Fischer Wedel King, Plfs' Exh. 2, they are regarded as part of the bottom metal facing sheet, either directly or by equivalents, to make out a case of infringement. Scott Rp. 282, l. 25–p. 283, l. 15.

20. Pierce's claim 7 is not infringed by any of Defendants' Skis in suit (Plf's Exh. 1 to 10), when the claim is construed in the light of Pierce's specifications, as it must be. Defendants' Skis have no "relatively thick core sheet", where the bend in the forward end of the ski is made. In fact, in most of Defendants' Skis, the wooden core does not extend forward of the bend at all. The caps of Defendants' Skis do not form extensions of the wooden core in the sense of and as shown in Pierce's drawings. The Side Strips in Defendants' Skis are not "of harder material" than the wooden core. Pierce's wooden core is soft spongy balsa wood; while Defendants' wooden cores are of very hard wood.

21. Pierce's claims 10, 11 and 12 are not infringed by any of Defendants' Skis in suit (Plfs. Exh. 1 to 10) when those claims are construed in the light of Pierce's specifications, as they must be. To make out a case of infringement, plaintiffs here treat the side strips and end caps in Defendants' skis as part of the "central core sheet"—which they clearly are not in the Pierce specification and drawings. But side strips are not specified as elements in Pierce's claims 10, 11 and 12—merely "exposed sides" or "exposed edges" of the "core sheet". In none of Defendants' skis are the sides of the wooden core "exposed", as claims 10, 11 and 12 require. Further, the sides of Defendants' Skis are not "beveled" as the claims require, which means "slanted" or "inclined", as shown in Pierce's Fig. 5. Defendants' Skis which have separate steel edges offset horizontally, cannot be regarded as having "beveled sides" in the sense of Pierce's claims 10, 11 and 12.

22. Plaintiffs' efforts to give claims 7, 10, 11 and 12 a meaning to make out a case of infringement and at the same time to distinguish the Kastle Ski conceded not to infringe, and to avoid the prior art of record, makes the Plaintiffs' task impossible of avoiding the defense of Indefiniteness of Pierce's claims, under 35 U.S.C. Sec. 112. If Pierce's claims can have so many different meanings to

make out infringement, and to avoid the prior art, that ipso facto renders the claims indefinite.

23. The Plaintiff, Sullivan, has entered a Consent Summary Judgment herein that no Skis manufactured and sold by Skifabrik Anton Kastle of Hohenems, Austria, infringe any claims of the Pierce patent. The Defendants' Skis charged to infringe claims 7, 10, 11 and 12 herein are in all significant and material respects identical with, and indistinguishable from, the Kastle Skis agreed not to infringe. Pierce's claims 7, 10, 11 and 12 are thus not infringed, by reason of Collateral Estoppel.

24. During the course of World War II Chance-Vought Division of United Aircraft Corporation, the manufacturers of the F4U Navy Fighter, among other airplanes, developed a metal plywood which they referred to as "Metalite". This material invented by Henry B. Gibbons is described in the Booklet entitled "Description of Metalite" (Dfts. Exh. K) and comprised of a molded laminated core of balsa wood, preferably edge-grained, covered on top and bottom with thin sheets of high strength aluminum alloy, and provided with an edging of higher density wood "usually spruce or hickory" (Robertson Rp. 193) surrounding the balsa wood core and between the aluminum sheets where an exposed panel edge may be subject to abuse or where bolts through the Metalite "are to be drawnup tight" (Dfts. Exh. K p. 11). Metalite was constructed by bonding the balsa wood core and aluminum facing sheets together under heat and pressure with all the bonds required being ordinarily made in one operation in a mold of the desired shape—(Dfts. Exh. K p. 5). This material showed great promise in that it achieved high strength at relatively light weight, and since it was formed in a molding process it could be formed either as flat sheets or in curved convex shapes.

The date of the development of "Metalite" is established in several ways. The Booklet, Dfts. Exh. K, was published at least as early as June 14, 1944, as evidenced by Dfts. Exh. J, and by the testimony of Robertson (Rp. 189). The material itself was used in commerce at least as early as January 6, 1944, as evidenced by Plfs. Trade Mark Registrations Nos. 409,812 (Plfs. Exh. S–18) and 793,175 (Plfs. Exh. S–19), and by the testimony of Mr. Robertson (Rp. 189–190). In addition "Metalite" is disclosed in two patent applications, one by Henry B. Gibbons, the other by Gibbons and Zoldy (Robertson Rp. 173–174). Both patent applications were filed on December 9, 1943 but only the Gibbons and Zoldy application matured to a patent No. 2,479,342 (Dfts. Exh. S–10), dated August 16, 1949. The Gibbons patent application (Ser. No. 513,619) was rejected on prior art and abandoned (Pierce Depn. p. 13–17, 26; Robertson Rp. 194 and 195).

25. In 1945, as the War drew to a close, Chance-Vought Aircraft, like many other companies, started looking around for civilian outlets for its products and skills. One such product with possible civilian use was of course "METALITE". Various suggestions were received from various people concerning possible uses of "METALITE" including such things as in truck bodies, as insulation for refrigerators, etc. Wayne M. Pierce, Jr., also an amateur skier and a Chief of Design Operations for Chance-Vought suggested that "METALITE" could be used as a ski. (Pierce Depn. p. 7–8) Three or four prototype skis were made during 1945, followed rather closely by a production run of 100 pairs of such skis for field test purposes. The Pierce patent application was filed on March 1, 1946 and the Pierce Ski referred to internally as the "METALITE" ski. Apparently the skis performed satisfactorily. However, the project was shelved by Chance-Vought after this initial test run on the ground that the skis would be too expensive to manufacture, and that at the high price at which they would have to sell the market would be too small. The patent application however was permitted to proceed in its normal course and it issued as the Pierce U. S.

patent in suit No. 2,525,618 on October 10, 1951. Chance-Vought itself took no further action with respect to the patent, or to the skis described and claimed therein (Pierce Depn. p. 7–8, 26, 30–32, Robertson Rp. 167). It is proved beyond doubt and the Court finds that the Metalite material was well-known and in use at least as early as January 6, 1944, by:

1. The Gibbons & Zoldy Patent No. 2,479,342, filed December 9, 1943 (Dfts' Exh. S–10).

2. The Booklet "Description of Metalite"—(Dfts. Exh. S–25).

3. The Metalite Trademark Registrations Nos. 409,812 and 793,175 (Dfts. Exh. S–18 and 19) with a claimed date of use in commerce of January 6, 1944. Pierce's claimed date of invention was "sometime in the Spring of '45". (Pierce Depn. p. 7). But most important, the prior existence of the Metalite material was well-known to Pierce, who sought to find another use for it, at the instigation of his employer, Chance-Vought, and to hundreds of men in the Aircraft Industry, and Aeronautics personnel.

26. The Metalite material developed by Henry B. Gibbons and Chance-Vought Aircraft is nowhere mentioned in the Pierce patent. Yet the Ski construction disclosed and described by Pierce is Metalite specifically, which Chance-Vought had developed and used in aircraft construction. And the advantages described for the Pierce ski, strength, light weight, flexibility, torsional resistance, and the like, are advantages inherent in the Metalite material as used in Chance-Vought airplanes. The Pierce ski construction is specifically stated to be "equally adapted to skis used as landing gear for airplanes" (col. 5, l. 17–18).

27. Mr. Robertson, Ling-Temco-Vought's Manager of Corporate Patents Administration, and Plaintiffs' patent expert, thus testified as to the identity of the Metalite material as shown in the Gibbons & Zoldy patent No. 2,479,342 granted August 16, 1949 and filed December 9, 1943 (Rp. 196–7):

"Q I ask you, sir, in your disclosure do you have a laminated structure?

A Yes.

Q Would you call that a laminated structure?

A Yes.

Q Including a relatively thick core sheet?

A Yes.

Q Then for the sake of convenience, calling the sides the portions 29, the front, and the portions 31, 32 and 34 the rear, does this structure have strips of harder material forming extensions that are at opposite ends?

A I believe so. The strips—yes, they are called marginal strips, 28, 29, 30 and 31.

Q Does the structure have strips of harder material extending between the end strips along the side of each sheet?

A You lost me.

Q I tried to define the portion marked as 29 as the front, and the portion marked as 31, 32 and 34 as the rear.

A At the end.

Q So those would be the two end strips. Does this structure have strips of harder material extending between said end strips along the sides of said sheets?

A Along the side, yes.

Q Are there adhesive means provided for securing said strips intact?

A I would think so.

Q Are the facing sheets of thin metal?

A It says so.

Q Do they over-lie the core sheet?

A Do they over-lie—do you mean do the metal sheets over-lie the core sheet?

Q The core sheet.

A Yes.

Q Are they adhesively secured thereto and to said strips?

A Yes.

Mr. Robertson thus testified as to the method of making the Metalite material (Rp. 197–198):

Q Referring again to the drawing, does figure 6 show that it was contemplated to mould this material to shapes other than flat shapes?

A Well, it shows a curved section, yes.

Q This is moulded to shape?

A Yes, it was.

Q How was it moulded to shape, if you remember?

A On a mould, over a mould.

Q You put it in a mould, use a rubber bag, and evacuate it and put it in an autoclave?

A Yes, essentially the way—

Q The same process as for skis?

A The same way as the ski, yes."

It is clear that the Pierce Ski of the patent was made of the Metalite construction and by the same method.

28. The essential structure defined in Pierce's claim 7 is also shown in the Swedish patent to Olsson No. 110,143 for a Ski (Dfts' Exch. S–17).

29. Plywood or laminated skis were old in the art:

| | | |
|---|---|---|
| Anderson U. S. Pat. | 2,038,530 – | Exh. S–2 |
| Broome | 2,184,791 – | S–3 |
| Davidson | 2,213,903 – | S–5 |
| Andreef | 2,356,809 – | S–8 |
| Heiler (German) | 688,194 – | S–12 |
| Horaczek " | 701,889 – | S–13 |
| Hammer " | 739,131 – | S–14 |
| Fortune Magazine March 1942 p. 152– | | S–22 |

Metal clad Plywood was old in the art.

| | |
|---|---|
| Fortune Magazine Jan. 1940, p. 123– | S–21 |
| Aviation Aug. 24, 1935– | S–20 |

Even as to the newly discovered function of the toe and heel caps acting as shear plates, Olsson Swedish patent 110,-143 (Exh. S–17) discloses toe and heel caps 10 and 11. Unlike those shown in the Pierce patent in suit, these extend a substantial distance along the length of the ski, toe cap 10 extending through the bend at the front of the ski. Thus the structure shown in Olsson in this respect is more like the structure of Defendants' Skis than like that shown in the Pierce patent.

Similar caps are shown in Hammer German Pat. 739,131 (Exh. S–14) and Horaczek German patent 701,889 (Exh. S–13) in laminated skis, and in Posse Austrian patent 145,534 (Exh. S–11) in non-laminated skis. That the function of the toe and heel caps in Olsson is the same as that asserted by plaintiff to such caps in Pierce is made quite clear by the testimony of Plaintiffs' witness Scott (Rp. 340–341):

"The use of inserted veneer strips with the grain running crosswise at the tip and tail of wooden skis was old and rather general. It had one function and one alone. The grain running crosswise made it almost impossible for the wooden ski to split, as they ordinarily did quite often, tip and tail."

Scott further testified (Rp. 280):

"Q Would a piece of wood or plastic form be effective shear plate in your opinion?

A Yes, if it were strong enough."

30. As to claims 10, 11 and 12—the only function ascribed by the patentee

Pierce for making the bottom of his ski wider than the top is to provide "sharp lower edges which can be resharpened by filing as is sometimes done in racing to obtain increased grip in performing fast maneuvers." (col. 3, lines 61–64)

Plaintiffs freely concede that it was old in Wooden Skis to offset the steel edges (i. e. to make the bottom of the ski wider than the top) to facilitate sharpening.

Plaintiffs' Ski Expert Scott testified (Rp. 250):

"When they found that the corners of the ski couldn't be kept sharp and therefore not effective in turning or stopping on hard snow, somebody had the idea of putting steel strips on them. Originally they thought only of maintaining the initial corner. They soon found out that even metal rounded off.

*Then they offset by merely staggering the steel outward,* like this (indicating). The early ones were all held on with screws. This is called an offset edge (indicating). It is very easy to sharpen with the common file."

Scott established this date (Rp. 278) thus:

"The first offset edges that I am clearly aware of would be in the late '30s."

31. Plaintiffs also attribute an alleged "buttressing" effect to the side strips in the Pierce patent. However, it is to be noted that Pierce's claims 10, 11 and 12 do not include the side strips 20 and 22 as an element in the claims. In any event, plaintiffs' witness Scott admitted (Rp. 281) that the "buttressing" effect was the same in both the embodiments shown in Pierce Fig. 4 and Pierce Fig. 5. But the "buttressing" effect, if any, is inherent in the structure, and if it exists in Pierce it also exists in Olsson Swedish Patent 110,143 where the hard wood side strips 5 and 6 back up or "buttress" the corner 7 of the lower facing sheet 2."

32. The owners of the Pierce patent have never manufactured Metal Skis commercially under the Pierce patent. The Chance-Vought Division of United Aircraft made 3 or 4 prototype Skis, and 100 pair in a production run in 1945 and 1946 when Wayne Pierce was with them, but they were experimental, and never commercially sold. But none of these had beveled sides as in Pierce's Figure 5 (Robertson Rp. 172).

However, plaintiffs rely on commercial manufacture of Metal Skis by Head Ski Co. of Baltimore, by Hart Ski Co. of Minneapolis and Josef Fischer of Austria, as showing "commercial success" of the Pierce patent. The Head Ski Co. is a licensee under the Pierce patent. But the only showing of a Head Ski construction is that embodied in a leaflet (Plfs' Exh. 33), and it is clear from examination that the Head Ski there shown does not have the structure meeting Pierce's claims 7, 10, 11 and 12. The Hart and Fischer Skis are currently involved in litigation in which the defendants deny infringement. Until the fact of infringement has been judicially determined, the Hart and Fischer Skis cannot be accepted as showing "commercial success of the Pierce patent".

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of the suit.

2. The claims of Pierce patent No. 2,525,618 in suit, namely, 7, 10, 11 and 12 thereof, are invalid because:

(a) The subjects matter thereof do not meet the high standard of invention test now required under 35 U.S.C. §§ 101 and 102;

(b) The subjects matter thereof constitute, at best, a mere substitution of old materials, i. e., "Metalite", in the fabrication of skis of conventional design and cross-sectional configuration;

(c) The differences between the subjects matter thereof and the prior art, including the "Metalite" material and the "Metalite" skis made therefrom, as well as the prior art patents and publications of record, were such that the subject's matter as a whole would have been obvious at the time the invention was made

**948**

to a person having ordinary skill in the art to which the subject's matter pertained, and that consequently there was a failure of the patentee to satisfy the conditions for patentability prescribed in 35 U.S.C. § 103;

(d) For indefiniteness, under 35 U.S.C. § 112, in their failure to point out and distinctly claim the subjects which the patentee regarded as his invention, in their use of the terms "relatively thick", "thin metal" and "harder material", in claim 7, and "substantial thickness" and "wider than" in claims 10, 11 and 12.

(e) The concept of bevelling the side edges of a ski to facilitate the sharpening of the edge of the metal runner of the ski, defined in claims 10, 11 and 12, is an old and familiar expedient and does not constitute invention.

3. Claim 7, if valid, is not infringed by the accused ski structures because they are not constructed in substantially the same way, for substantially the same purpose and with substantially the same result as the laminated ski of claim 7 of the patent in suit.

4. Claims 10, 11 and 12 of the patent in suit, if valid, are not infringed by the accused ski structure because they are not constructed in substantially the same way, for substantially the same purpose and with substantially the same result as the laminated wood and metal skis of claims 10, 11 and 12 of the patent in suit.

5. Claims 7, 9, 10, 11 and 12 of the patent in suit, are not infringed by the accused ski structures because the accused structures are substantially indistinguishable from the Kastle ski from the standpoint of construction, purpose and result, applying the doctrine of collateral estoppel in consideration of the fact that the owners of the Pierce patent in suit stipulated on August 4, 1964, in Civil Action No. 42,551, to entry of a Consent Partial Summary Judgment that the said Kastle ski did not infringe the claims of the Pierce patent in suit.

6. That in Civil Action No. 42,070 Sullivan et al. v. Sears, plaintiff's take nothing by their complaint and the same is hereby dismissed.

7. That in Civil Action No. 42,551, Dartmouth v. Ling-Temco-Vought, Inc. et al, plaintiff shall have a declaratory judgment adjudging that claims 7, 10, 11 and 12 of the patent in suit are invalid; if valid, they are not infringed by the accused ski structures.

8. That Defendants, Sears and Dartmouth, in Civil Action No. 42,070, and Plaintiff, Dartmouth, in Civil Action No. 42,551, are hereby awarded their costs of suit to be taxed by the clerk in accordance with the rules.

9. That a judgment be prepared and submitted in accordance with the foregoing.