**T & T MANUFACTURING COMPANY,**
Plaintiff, Jonathan Bradley Pens, Inc.,
Intervenor, the Quill Company, Inc.,
Second Intervenor,

v.

**A. T. CROSS COMPANY, Defendant.**

Civ. A. No. 5267.

United States District Court,
D. Rhode Island.

March 24, 1978.

James K. Edwards, Providence, R. I., for plaintiff and intervenor.

George L. Graff, New York City, for intervenor Jonathan Bradley Pens.

Robert L. Thompson, Boston, Mass., for second intervenor Quill Co.

Herbert B. Barlow, Jr., Providence, R. I., Leslie D. Taggart, New York City, for defendant.

## OPINION

PETTINE, Chief Judge.

T & T Manufacturing Company (T&T) filed this action on appeal from a decision of the Trademark Trial and Appeal Board of the United States Patent and Trademark Office (Board)[1] that upheld the application of the defendant A. T. Cross Company (Cross) to register as a trademark the silver-colored top on its writing instruments.

Defendant Cross and plaintiff-intervenors Jonathan Bradley Pens, Inc. (Bradley) and The Quill Company, Inc. (Second-Quill), engage in the manufacture and sale of mechanical pens and pencils. Plaintiff T&T sells mechanisms and findings for mechanical pens and pencils and wholly owns the intervenor Second-Quill, its subsidiary. T&T joined by the intervenors on appeal from the Board, sought a declaration that Cross' trademarks are invalid and that neither T&T, Second-Quill, nor Bradley infringe those trademarks, nor engage in unfair competition.

Jurisdiction is under Sections 21, 32(1) and 39 of the Lanham Act, 15 U.S.C.

1. T & T's notice of appeal to the Court of Customs and Patent Appeals was answered by Cross by a notice of election filed by Cross under 15 U.S.C. § 1071 and as a result the present action was instituted in this Court.

§§ 1071, 1114(1) and § 1121 and 28 U.S.C. § 1338.

The complicated background of this case needs to be set forth to appreciate the present posture of the controversy. On June 19, 1951, trademark registrations were issued to Cross for a black top (Reg. No. 543,934), and on April 11, 1967, for a gold top (Reg. No. 827,167), on its mechanical pens and pencils. There is also pleaded Registration No. 920,728 which is for essentially the same mark as Registration No. 543,934. It is agreed reference to Registration No. 543,934 may be considered reference to Registration No. 920,728.

In 1965 a Rhode Island corporation named The Quill Company (First-Quill), was engaged in the manufacture of mechanical pens and pencils. On October 25, 1965 Cross filed suit against First-Quill in this Court (C.A. 3563), alleging infringement of its trademark registration numbered 543,-934. This case was settled by an agreement between First-Quill and Cross dated November 29, 1967. By the terms of said agreement First-Quill could continue manufacturing its writing instruments that had black, silver and gold conical tops (exhibits C, D and F). The precise wording of the agreement is:

1. QUILL hereby agrees not to manufacture or sell any writing instrument which has an exterior appearance closer to the exterior appearance of the CROSS pen and pencil attached hereto as Exhibits A and B than the exterior appearance of the QUILL pen and pencils attached hereto as Exhibits C, D and F, so long as the said CROSS trademark is respected by the trade and said trademark registrations remain in full force and effect.

2. CROSS agrees that it will not sue QUILL for unfair competition, infringement of said trademark or infringement of said trademark registrations unless QUILL breaches the agreement of paragraph 1.

3. CROSS hereby releases QUILL and its customers from all debts, complaints, demands and causes of action and whatsoever such as have arisen by reasons of or in any manner grown out of the facts alleged in said Civil Action prior to the date of this agreement.

4. The parties agree that forthwith after the execution of this agreement said Civil Action shall be terminated by a Consent Judgment dismissing it without prejudice and without any award of damages or costs to either party.

5. This agreement shall be deemed to constitute a contract made under the laws of the State of Rhode Island and for all purposes shall be construed in accordance with the laws of such State.

6. This agreement shall be binding upon and inure to the benefit of each party, its successors in business and assigns.

On November 21, 1969, Cross filed an application to register a silver top. The application was for "a silver frustro-conical member at the end of a writing instrument body opposite the writing point, which member is adjacent to a portion of contrasting color". T&T, at that time a manufacturer of mechanical pens and pencils with a silver end member, opposed the application, claiming prior first use and continuous manufacture of its pens and pencils with silver tops. It further claimed, "Applicant's Silver End Member is not capable of functioning as a trademark and that silver end members adjacent to a portion of contrasting color or non-contrasting color for pens and pencils is common, general and/or descriptive to the pen and pencil industry and accordingly is not the proper subject for a monopoly. . . ." T&T's opposition was dismissed on April 27, 1973, and T&T appealed.

In March of 1972, while the opposition was pending, T&T purchased from First-Quill the settlement agreement between First-Quill and Cross. It also purchased the pen and pencil equipment and supplies that First-Quill had on hand.

On September 21, 1972, T&T incorporated Second-Quill as a wholly-owned subsidiary; on September 28, 1972, T&T executed an assignment of its rights under the 1967 settlement agreement to Second-Quill and sold Second-Quill the equipment it had ac-

quired from First-Quill. Second-Quill then started manufacturing and selling pens and pencils with tops which are the subject of this suit. T&T had discontinued manufacturing complete pens and pencils in 1970.

There is no need to discuss the position of Intervenor Bradley in this case because, by agreement of partial discontinuance, the claims of all parties in the Bradley controversy have been dismissed with prejudice. Similarly, by agreement, T&T accepted the decision of the Board dismissing T&T's opposition. All that remains in the case is the complaint of Second-Quill seeking a declaration that Cross' trademark registrations 543,934 and 827,167 are invalid; and that Second-Quill's sales of its writing instruments do not infringe Cross' trademarks or constitute unfair competition. Also remaining is Cross' counterclaim seeking dismissal of Second-Quill's complaint, injunctive relief and an accounting.

## I. VALIDITY OF CROSS' TRADE-MARKS

A trademark is an identifying character of goods that is designed to attract potential customers by labeling the particular item with its maker's reputation. A well-earned reputation is profitably exploited through the mechanism of trademark merchandising. Trademark law recognizes as well the concomitant right of the purchaser to be protected from the ingenuity of the exploiters making similar goods who seek to mislead him.

The United States Supreme Court described the function of trademarks in *Mishawaka Mfg. Co. v. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942) thus:

> The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising shortcut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.

In *A. E. Staley Manufacturing Co. v. Staley Milling Co.*, 253 F.2d 269, 275 (7th Cir. 1958), the Seventh Circuit further articulated the dual purpose of trademarks:

> Our alertness to the social values in and functions of trademarks flows from and parallels the dual purposes of the trademark statute . . . [o]ne . . . to protect the public so that it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trademark has spent energy, time and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

■ Since Second-Quill has challenged the validity of Cross' trademarks, the Court must make the threshold determination that the trademarks are indeed valid. Basically, we are talking of a color combination—namely, a colored top against a barrel of contrasting color. Cross concedes, as it must, that color alone cannot be appropriated as a trademark. However, it points out that its trademark is the application of a color in an arbitrary manner to a conical shaped portion of the top of its writing instruments, with a barrel and writing portion of the same or contrasting color. This motif creates a unique and distinguishing commercial impression which is exclusively Cross'. As the First Circuit has recently held, "Color in combination with a distinctive arbitrary design can be a valid trademark." *Quabaug Rubber Company v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 161 (1st

Cir. 1977), *citing Mishawaka Rubber & Woolen Manufacturing Co. v. Panther-Pan-co Rubber Co.,* 153 F.2d 662, 68 U.S.P.Q. 232 (1st Cir. 1946).

Cross correctly cites decisions by many courts that have recognized and protected trademarks consisting of a design similar to Cross' mark, *e. g., Mishawaka Mfg. Co. v. Kresge Co., supra,* (a "red dot" in rubber heels); *Pachmayr Gun Works, Inc. v. Olin Mathieson Chemical Corp.,* 502 F.2d 802, 805 (9th Cir. 1974) (a "white line" on gun recoil pads); *Application of Data Packaging Corp.,* 453 F.2d 1300, 1301, 59 CCPA 776 (1972) (" . . . a narrow annular band mounted on the front reel flange, adjacent to and concentric with the hub of the reel, in a color which contrasts with the reel flange.") *See also Application of Worlds Finest Chocolate, Inc.,* 474 F.2d 1012, 1014 (Cust. & Pat.App.1973); *Application of G. LeBlanc Corporation,* 429 F.2d 989, 992 (Cust. & Pat.App.1970); *Truck Equipment Service Company v. Fruehauf Corporation,* 536 F.2d 1210, 1217–1218 (8th Cir. 1976).

Recognizing that a trademark is not the same as a "patent" or a "copyright", in that it is a right only "appurtenant to an established business or trade in connection with which the mark is employed", *United Drug Co. v. Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918),[2] *see also Radio Shack Corporation v. Radio Shack, Inc.,* 180 F.2d 200 (7th Cir. 1950), *Le Blume Import Co. v. Coty,* 293 F. 344, 351 (2d Cir. 1923), *Philip Morris, Incorporated v. Imperial Tobacco Company (of Great Britain and Ireland, Limited),* 251 F.Supp. 362 (E.D.Va.

**2.** In *United Drug Co.,* the Court wrote:

The asserted doctrine is based upon the fundamental error of supposing that a trademark right is a right in gross or at large, like a statutory copyright or a patent for an invention, to either of which, in truth, it has little or no analogy. *Canal Co. v. Clark,* 13 Wall. (80 U.S.) 311, 322 [20 L.Ed. 581]; *McLean v. Fleming,* 96 U.S. 245, 254 [24 L.Ed. 828]. There is no such thing as property in a trade mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not

1965) *aff'd* 401 F.2d 179 (4th Cir. 1968), Cross introduced evidence of its continuous activity in the manufacturing of mechanical pens and pencils of a distinctive design identified by a top in contrasting color to the barrel of the writing instrument, the wide public recognition of its product, extensive advertising in national publications since 1965, ($14,406,457 for years 1960–1976), its multi-million dollar sales ($241,-199,559 for years 1960–1975), the registration of its black top in 1951 and of one in gold in 1967, and, finally, the decision of the Trademark Trial and Appeal Board dismissing T&T's opposition to its application for the silver top.

An evaluation of the evidence and the applicable law firmly convinces this Court that both the evidence and the law decidedly preponderate in favor of Cross and clearly establish the validity of its trademarks.

■ To arrive at its ultimate decision, this Court must review the Board's findings; the Court is required to follow the findings of the Board "unless the contrary is established by evidence carrying 'thorough conviction'", imposing a substantial burden on an opposer to overcome the Board's purely evidentiary findings. *Sarah Coventry, Inc. v. T. Sardelli & Sons, Inc.,* 526 F.2d 20, 21 (1st Cir. 1975) *cert. den.,* 426 U.S. 920, 96 S.Ct. 2626, 49 L.Ed.2d 374 (1976), *aff'g* 392 F.Supp. 347 (D.R.I.1975). Moreover, I independently reach the Board's conclusion.

■ Cross' trademark is not confined to a black or gold top. The Board correctly

its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business. *Hanover Milling Co. v. Metcalf,* 240 U.S. 403, 412–414 [36 S.Ct. 357, 60 L.Ed. 713] . . . . In truth, a trade-mark confers no monopoly whatever in a proper sense, but is merely a convenient means for facilitating the protection of one's good-will in trade by placing a distinguishing mark or symbol—a commercial signature—upon the merchandise or the package in which it is sold. 248 U.S. at 97–98, 39 S.Ct. at 50.

noted that: "a party in position of defendant [Cross] may defend his right of registration of a particular mark for particular goods on the basis of prior registration and/or use of a substantially similar mark for like or substantially similar goods." Board Op. No. 50831, April 1973, at 14. The Board's quote from *Humble Oil & Refining Company v. Sekisui Chemical Company Ltd. of Japan*, 165 U.S.P.Q. 597 (Trdmk. Tr. & Ap. Bd., 1970) is particularly apropos:

It is settled that a person may change the display of a mark at any time because whatever rights he may possess in the mark reside in the term itself rather than in any particular form or arrangement thereof . . . The only requirement in these instances is that the mark be modified in such a fashion as to retain its trademark impact and symbolize a single and continuing commercial impression. That is, a change which does not alter its distinctive characteristics represents a continuity of trademark rights. Thus, where the distinctive character of the mark is not changed, the mark is, in effect, the same and the rights obtained by virtue of the earlier use of the prior form inure to the later form. . . . *Quoted in Board Op. No. 50831, at 14–15.*

The Board further found that T&T had acknowledged that it was aware of Cross' use of a black conical shaped top on its writing instruments and of its recognition by the trade and the purchasing public, long prior to the time that T&T first began to use a silver-colored conical top on its writing instruments. As evidence of Cross' continuous use, the Board considered the fact that the filing for registration of the gold conical top (Registration No. 827,167) by Cross (which matured into the registration on April 4, 1963) preceded T&T's first use of the silver-colored conical member. *See Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, Standard Brands Inc.*, 261 F.Supp. 200, 205 (N.D.Ill.1966) (Registration—presumption of continued use). The Board quite properly focused upon:

whether the identical conical-shaped top in the silver color for which registration is now being sought is a continuation of trademark rights acquired by applicant through its prior use of the black and gold-colored conical devices. This narrows down as to whether the use of an identical conical shape in three different colors represents three different marks or but a single mark in different displays. It is our opinion that applicant possesses but a single mark which covers the application of color to an arbitrary selected conical-shaped portion of the top of its writing instruments as against a barrel of a contrasting color; that by virtue of its prior use of this device or mark, per se, applicant possesses rights therein covering all of the different colors in which the conical shaped portion may appear. [Cf. *In re Data Packaging Corp.*, 172 USPQ 396 (CCPA, 1972)]; and that such rights occur as of the time of first use. Slip Op. at 15–16.

■ Any argument of prior first use of the silver top is of no consequence here. The undisputed fact of Cross' use "of a black conical shaped top on its writing instruments and the recognition thereof in the trade and by the purchasing public at and long prior" to any use of a colored conical top by Quill, and the legal conclusion by this Court that Cross possesses but a single mark "which covers the application of color to an arbitrary selected conical shaped portion of the top of its writing instruments as against a barrel of a contrasting color", thus covering all of the different colors in which the conical shaped portion may appear, puts this issue to rest. I find that Cross has a valid trademark and that Second-Quill cannot properly assert any rights against Cross in substantially similar configurations.[3]

## II. INFRINGEMENT BY SECOND-QUILL

Defendant Cross has cross-claimed that Second-Quill is presently infringing its

---

3. This finding does not consider Quill's rights pursuant to the November 29, 1967 agreement, discussed *infra*.

trademark for writing instrument tops. The claim arises under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), which provides as follows:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use *is likely to cause confusion,* or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use *is likely to cause confusion,* or to cause mistake, or to deceive;

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used *to cause confusion,* or to cause mistake or to deceive. (Amended Oct. 9, 1972, 72 Stat. 769). (Emphasis added.)

By the statute's terms, the central issue is whether or not a likelihood of confusion exists on the part of the buying public because of the similarities between the plaintiff's and defendant's writing instruments.

To find a trademark infringement, the Court weighs the evidence of the likelihood of confusion, not ". . . as an enlightened educator of the public but tak[ing] into account the mythical ordinary prospective purchaser's capacity to discriminate as well as his propensity for carelessness". *E. I. DuPont De Nemours & Co. v. Yoshida International, Inc.,* 393 F.Supp.

502, 510 (E.D.N.Y.1975). The likelihood of consumer confusion has been termed a question of fact. *Coca-Cola Company v. Snow Crest Beverages, Inc.,* 162 F.2d 280 (1st Cir. 1947). Judge Markey in *Application of E. I. DuPont De Nemours & Co.,* 476 F.2d 1357 (Cust. & Pat.App.1973), citing the *Snow Crest* case, wrote: "If labeled a mixed question or one of law, it is necessarily drawn from the probative facts in evidence. As so often said, each case must be decided on its own facts. There is no litmus rule which can provide a ready guide to all cases." *Id.* at 1361. This, of course, is true and no matter how sophisticated a jurist may be in articulating variations of the test, or in setting forth factors to be considered, the end result is nothing more than the personal acid/base determination of the trial or appellate court. We are not lacking in decisional expressions and, laudably, counsel have shown no reserve in citing many to the Court that establish the subjective nature of the inquiry, *e. g., Venetianaire Corporation of America v. A & P Import Co.,* 302 F.Supp. 156, 158 (S.D.N.Y. 1969), *aff'd* 429 F.2d 1079 (2d Cir. 1970); *Lambert Pharmacal Co. v. Bolton Chemical Corp.,* 219 F.2d 325, 328 (S.D.N.Y.1915). Not only is the final analysis subjective, but evidence of actual instances of confusion is unnecessary provided the Court is satisfied that substantial numbers are likely to be confused. *Swarthmore Classics, Inc. v. Swarthmore Junior,* 81 F.Supp. 917, 920 (S.D.N.Y.1949).

Nonetheless, it is important to look to those "general principles that do transcend the particulars . . . an overly analytical approach with close attention to specific differences is less important than the overall impression of general similarity . . . [W]here . . . evaluation of *all* pertinent factors still leaves the matter in some doubt, such doubt should be resolved against the newcomer". *E. I. DuPont de Nemours & Co. v. Yoshida International Inc.,* 393 F.Supp. at 510. The evaluation of "all pertinent factors" must, of course, refer "not only to the characteristics of the trade-mark, but also to the distinguishing differences or indistinguishable similarities

of the goods themselves, with reference to their form, composition, texture, and quality and the manner in which they are advertised, displayed, sold and used". *Solventol Chemical Products v. Langfield*, 134 F.2d 899, 902 (6th Cir. 1943).

Second-Quill argues that a reasonably prudent buyer would have no difficulty in recognizing a Quill instrument as against one manufactured by Cross and, in support, points to the following differences between them: "(a) the end of the Cross top is black (see Ex. A) whereas that of the Second-Quill top is not black, but silver (see Ex. C & D); (b) the Cross top is solid black (Ex. A) whereas the Second-Quill top has metallic bands and therefore is not solid black (Ex. C); (c) the Cross top is entirely frustro-conical (i. e. a cone-like top with the tip cut off by a plane parallel to the top), whereas the end of the Second-Quill top is cylindrical; and (d) the taper of the Cross top continues to the end in the same line as the barrel of the instrument, but that of the Second-Quill does not." (Quill's Proposed Findings of Fact and Conclusions of Law, p. 10).

Although differences in the Quill instruments do exist, these differences do not overcome the probability of confusion resulting from an overall impression. At most, they leave the matter in doubt, doubt which should and must be resolved against Quill. Although Second-Quill's top differs from Cross' in that Second-Quill's is not completely black, black clearly predominates on the Quill top—the black is interspersed with only two thinly drawn silver stripes and a broader top of silver. To this Court, the overall impression is that of the well-known Cross top. The writing instruments are substantially similar in form as well, despite the fact that the Cross top is entirely frustro-conical, whereas the end of

the Second-Quill top is cylindrical, and that the taper of the Cross top continues to the end in the same line as the barrel of the instrument, but that of the Second-Quill does not.

■ These differences are not readily distinguishable to an "ordinary prospective purchaser". They certainly became evident in the trial of this case[4] but that was after Quill meticulously pointed them out with the visual aids of enlarged photographs during a side-by-side comparison. This was done to assist the Court and, recognizing the subjective aspect of these cases, I cannot say these differences would have been noticeable if attention had not been focused in that direction. It is inconceivable to me that the reaction of an average buyer, or, as Second-Quill puts it, a "reasonably prudent buyer", would be any different. An average purchaser does not retain all the details of a mark, but rather the mental impression the mark creates in its totality. These writing instruments are virtually identical in size, shape, composition and in all other respects. I find that whatever differences exist, they are not so perceivable to a "reasonably prudent buyer" as to obviate confusion, mistake or deception. This is all the more significant because the mark in question is on identical products catering to the same market and channels of trade; *see Chester Barrie, Ltd. v. The Chester Laurie, Ltd.*, 189 F.Supp. 98, 101 (S.D.N.Y.1960). Moreover, the items are intended for retail sale to the untutored public.

The Court's conclusion is consistent with decisions of long-standing. For example, in *Keystone Macaroni Mfg. Co. v. Arena & Sons*, 27 F.Supp. 290, 292 (E.D.Pa.1939), the district court found:

\*   \*   \*   \*   \*   \*

I don't need those pictures. I don't need my glasses to see the differences that have been pointed out by Mr. Bedford and Mr. Tessier as to the configurations of the tip [Top] in the Quill pen as against the tip [Top] of the Cross pen.

4. Counsel for Second-Quill makes much of the Court's comment in the course of the trial (pp. 306–07 Tr.):

We cannot deny that the tip opposite the writing point in the Quill pen is different from the tip opposite the writing point of the Cross pen. There is no question that the top of it is entirely silver, there is no question that the top of it is not frustro conical.

These are the essential differences in detail which distinguish the respective medallions, but they are not readily apparent upon a hasty glance nor would they be detected upon examination at a distance. The principal features and consequently the general impression of both marks is of a medallion containing an armored knight on a rearing horse, and, without attention being called to the differences of detail, it seems doubtful that an ordinary buyer, guided by his recollection of a mark rather than a name, might readily be confused. We can conceive that a person, carrying in mind the picture of a medallion with a mounted knight, and relying upon the memory of a package, might easily forget the details of the respective pictures and consequently select one brand instead of the other, and especially if he had not memorized the brand names or associated them with the respective manufacturers.

Similarly, in *Paris Medicine Co. v. W. H. Hill Co.,* 102 F. 148, 150–151 (6th Cir. 1900), the court said:

It must be admitted that the resemblances between the trade-name and dress of the rival preparations here involved are numerous and striking. There are differences between their packages, including differences in the colors of the lettering thereon, but the differences are less observable than the resemblances. An intentional infringer is never likely to make his packages exactly like that of the tradesman whose trade he proposes to steal. To avoid the consequences of infringement, an intentional infringer will usually take care that there are plenty of what Judge Lacombe, in *Scheuer v. Muller,* 74 F. 225, 228, 20 C.C.A. 161, called "arguable differences", to stand upon when brought into court, but resemblances to the article he desires to imitate sufficient to deceive the average purchaser into buying the simulated article as and for the goods of another.

\* \* \* \* \* \*

When there are found strong resemblances, the natural inquiry for the court is, why do they exist? If no sufficient answer appears, the inference is that they exist for the purpose of misleading. *Taylor v. Taylor,* 2 Eq.Rep. 290. We are to remember that the average purchaser has seldom the opportunity of making a close comparison; that he is apt to act quickly, and is therefore not expected to exercise a high degree of caution.

*See also Mishawaka Mfg. Co., v. Kresge Co.,* 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942).

This Court's conclusion that the overall similarity is likely to cause confusion is based not only on a side by side comparison of the instruments, but also, as Second-Quill has urged, in light of the manner in which consumers purchase these products, including the advertising, displaying and selling of the writing instruments. *See Harold F. Ritchie v. Chesebrough-Pond's Inc.,* 281 F.2d 755, 760 (2d Cir. 1960); *Goldsmith Silver Co. v. Savage,* 229 F. 623 (1st Cir. 1915); *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, Standard Brands Inc.,* 261 F.Supp. at 204. Second-Quill has pointed out that the Cross instruments are in special displays furnished by Cross that have a sign on top reading "Cross", whereas Second-Quill's instruments are commonly displayed in retail stores in counter displays furnished by Second-Quill which have the name "Quill" prominently marked on them. Second-Quill also notes that Cross' writing instruments are sold in small boxes on which appears the name "Cross" both on the inside and outside of the box; Second-Quill's writing instruments are sold in small boxes bearing the name "Quill" as well as the Quill logo, a registered trademark that consists of a stylized letter "Q" with a feather as the stroke of the Q. Moreover, every individual box in which Cross writing instruments are sold contains a written guarantee on which the name "Cross" appears; every individual box in which Second-Quill writing instruments are sold contains a guarantee on which the name "Quill" and the Quill logo appear. Finally, the clip of every Cross writing instrument bears on it the word "Cross"; the clip of

every Second-Quill instrument bears the word "Quill" and a feather.

■ These facts raise the question of whether Second-Quill has sufficiently diminished the likelihood of confusion to escape the charge of infringement simply by including its name in the "dress" of its product, which is otherwise so similar to Cross' trademarked top that it is likely to cause confusion among the buying public. I conclude that the likelihood of confusion is not negated.

■ In a case of trademark infringement, as opposed to a claim based solely upon unfair competition, the display of the housename of the alleged infringer along with another manufacturer's mark is merely relevant to whether a likelihood of confusion exists, but it does not necessarily excuse infringement. *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, Standard Brands, Inc.*, 261 F.Supp. at 206. *See generally* McCarthy, Trademarks and Unfair Competition, § 23–15(H) (1973). In fact, display of the housename generally does not excuse infringement of a valid trademark, *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 135–36 (S.D. N.Y.1972); *see Menendez v. Holt,* 128 U.S. 514, 524, 9 S.Ct. 143, 32 L.Ed. 526 (1888). By contrast, in cases involving only unfair competition wherein the intent of the defendant is an element of the charge, display of the housename is strong evidence of lack of intent to deceive. *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. at 136. Thus decisions which found either no valid trademark or no confusion, *e. g., Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *American Rolex Watch Corp. v. Rioch Time Corp.*, 491 F.2d 877 (2d Cir. 1974); *Swank Inc. v. Anson, Inc.*, 104 F.Supp. 703 (D.R.I.1951), *aff'd*, 196 F.2d 330 (1st Cir. 1952); *see, e. g., Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309–10 (2d Cir. 1972), are inapposite to the case at bar, since the Court has found that Cross had a valid trademark in the motif of the writing instruments' tops and that Second-Quill's tops are so similar as to cause public confusion.

To permit Second-Quill to appropriate with impunity Cross' trademark—the product of many years of advertising and long identified with the company's reputation for fine manufacture—simply by addition of Second-Quill's housename, would make a mockery of trademark law. *See Menendez v. Holt,* 128 U.S. at 524, 9 S.Ct. 143; *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689 (2d Cir. 1972); *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir. 1970); *Gillott v. Esterbrook,* 47 Barb. 455, 48 N.Y. 374 (1867), *cited approvingly in Menendez v. Holt,* 128 U.S. at 524, 9 S.Ct. 143. Indeed, to permit this piracy would be in effect to reward the cunning infringer and punish only the bumbling one. As the *Gillott* court noted many years ago:

> Where the trade mark is a conspicuous device connected with the name of the true proprietor, of course the imitator would desire to avoid the offense of forgery, and would omit on his own article the name of the true proprietor and substitute his own; but the real device might be copied with the imitator's name and other words of the original added which may be also true as regards the imitator's article, and yet as effectually mislead the public as in any other way. 47 Barb. at 469.

Courts have viewed combining the alleged infringer's housename with the other manufacturer's tradename as an aggravating circumstance, rather than an excuse for the infringement. The combination leads the purchaser to assume that the infringer is an authorized branch of the owner of the trademark, *e. g., Menendez v. Holt,* 128 U.S. at 524, 9 S.Ct. 143; *A. T. Cross v. Jonathan Bradley Pens, Inc.*, 470 F.2d at 692. That danger may be less likely in the instant case where the housename of the infringer is not coupled with Cross' tradename, but there is nonetheless a significant possibility that the purchaser may assume that Second-Quill is licensed to sell Cross pens and pencils.

■ Display of the infringer's name on the package is least likely to avoid confusion when the infringement involves the design of the item itself and not the pack-

age or the tradename. When the only similarity involves the packaging or the tradename, the very thing that confused the customer will also include the identification of the true source of origin. In the instant case, however, if the customer simply views the item rather than the outer trappings, the clue to the true identity remains hardly visible. Moreover, the fact that the actual purchaser may become aware of the source does not preclude a finding of infringement. The Lanham Act was amended in 1962 to eliminate the requirement that the confusion had to be suffered by "purchasers as to the source of origin of such goods or services". Consistent with this amendment, courts have recognized infringement even when the purchaser would be informed by reading the package, if the public generally, and users and donees more specifically, would remain confused by the similarity of the products, e. g., *Rolls-Royce Motors Ltd. v. A & A Fiberglass Inc.*, 428 F.Supp. 689, 694 n.10 (N.D.Ga.1977); *see A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d at 692; cf. *Syntex Laboratories Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2d Cir. 1971). The public identification of the prestigious Cross firm with the trademarked motif will predominate despite outside labels. Public expectations and Cross' expectation that Cross motif is both unique and signifies the fine craftsmanship associated with that firm are preserved by the protection of the Lanham Act.

## III.  THE CONTRACT ASSIGNMENT

Another hard question in this case concerns the legality and effect of T&T's purchase, in March, 1972, of the 1967 settlement agreement between First-Quill and Cross in 1967 and T&T's assignment of it to Second-Quill in September 1972. Second-

Quill contends that it is a "successor in business and assign" of First-Quill, that Second-Quill, T&T and First-Quill have all fulfilled their obligations to Cross under the agreement, and that Second-Quill is therefore entitled not to be sued by Cross for infringement for the manufacture and sale of writing instruments like exhibits C, D and F.

Cross argues this cannot be. First-Quill had abandoned its pen and pencil business after the 1967 Agreement and four years prior to the March 1972 assignment to T&T. Therefore, the assignment was void, Cross claims, because a trademark cannot be transferred without the accompanying business and attendant good will.

Is this assignment to be governed by trademark law including the law of abandonment and non-use; or is the 1967 Settlement Agreement a contract to be enforced as such?

Most cases cited by Second-Quill, *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368 (6th Cir. 1976); *Danskin, Inc. v. Dan River, Inc.*, 498 F.2d 1386 (Cust. & Pat.App.1974); *Li'l Red Barn, Inc. v. Red Barn System, Inc.*, 322 F.Supp. 98 (N.D.Ind.1970), aff'd 174 U.S.P.Q. 193 (7th Cir. 1973); *California Packing Corp. v. Sun Maid Raisin Growers of California*, 81 F.2d 674, 676 (9 Cir.); *Republic Pictures Corp. v. Rogers*, 213 F.2d 662 (9th Cir. 1954); *Sullivan v. Sears, Roebuck & Co.*, 282 F.Supp. 938 (N.D.Cal.1967), deal with trademark contracts between two active parties involving existing and on-going rights. They do not satisfactorily assist in answering the question at issue.

Cross' citations in its briefs concern the classic black letter law of abandonment and non-use of trademarks [5] by an original own-

---

**5.** The Lanham Act in Section 45 [15 U.S.C. 1127]:

  *Abandonment of Mark.* A mark shall be deemed to be "abandoned"—
  (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

*Sheila's Shine Products Inc., v. Sheila Shine, Inc.* 486 F.2d 114, 124 (5th Cir. 1973):
  The actual cessation of an established business plus an intent to abandon it is sufficient to constitute abandonment and concomitant loss of rights in a trademark . . . Intention to abandon a trademark may be inferred from the facts surrounding physical abandonment.

In *Golenpaul v. Rosett,* 174 Misc. 114, 18 N.Y. S.2d 889, 45 U.S.P.Q. 45, 47–48 (Sup.Ct. N.Y. County 1940) the Court said:

Rather strong statements appear in numerous cases to the effect that to constitute abandonment of a trade-mark or trade-name there must not only be nonuse but an intent to abandon (*Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60; *Baglin v. Cusenier Co.,* 221 U.S. 580, 597, 598, 31 S.Ct. 669, 55 L.Ed. 863; *Beech-Nut Co. v. Lorillard Co.,* 273 U.S. 629, 632, 47 S.Ct. 481, 71 L.Ed. 810, which are cited in *Rockowitz C. & B. Corp'n v. Madame X Co., Inc.,* 248 N.Y. 272, 162 N.E. 76, and *Neva-Wet Corp'n v. Never Wet Processing Corp'n,* 277 N.Y. 163, 13 N.E.2d 755 [36 USPQ 551]), and if those expressions are to be taken literally, abandonment never can be found in any case where abandonment is denied and the denial is supported by an oath as to the swearer's state of mind which the trier of the facts is unwilling to say is false swearing. That result is plainly inconsistent with and wholly nullifies the well-settled principle that a trade-mark right is not a right in gross or at large, like a copyright or a patent, and exists only as appurtenant to an existing business in connection with which it is used (*Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 414, 36 S.Ct. 357, 60 L.Ed. 713; *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141; which likewise are cited and quoted in *Rockowitz C. & B. Corp'n v. Madam X Co., Inc.,* 248 N.Y. 272, 278, 279, 162 N.E. 76, and cited in *Neva-Wet Corp'n v. Never Wet Processing Corp'n,* 277 N.Y. 163, 13 N.E.2d 755 [36 USPQ 551]). As the Court of Appeals expressly reiterates that principle in the *Madame X* case, and as it also states in the *Neva-Wet* case that intermittent periods of non-user do not destroy the right "if the business employing the trade marks was more or less continuous" (277 N.Y., at page 175, 13 N.E.2d, at page 761), I think those cases are not inconsistent with but actually sustain the view that when the business itself actually ceases for such a length of time and under such circumstances that the mark or name actually no longer signifies that business in the mind of the public the right to the mark or name is lost, despite the existence of a purely subjective "intent" on the part of the user to re-engage in the business and resume the use of the mark or name at some indefinite time in the future; and that I think is the sounder view and the only one consistent with the essential nature of a mark or name as a mere incident or appurtenance of a business (*Royal Baking Powder Co. v. Raymond,* 70 F. 376, 380, 381 (7 Cir.), aff'd 85 F. 231 (7 Cir.); *Reconstruction Finance Corp'n v. J. G. Menihan Corp'n,* 28 F.Supp. 920, 923 (D. C.) [42 ULPQ 504]; 30 Columbia Law Review, 695, 697; Deren-

berg, Trade-Mark Protection and Unfair Trading, 1936, pp. 598, 601).

In *Uncas Manufacturing Company v. Clark & Coombs Company, supra* 200 F.Supp. 831 at 835, this Court stated:

While it may be that the responsible officers of Griffith entertained a subjective intention not to abandon said mark, the existence of such intention is not sufficient to avoid abandonment where an objective analysis of the situation warrants the inference of abandonment. This rule is set forth clearly in *American Photographic Pub. Co. v. Ziff-Davis Pub. Co.,* 1943, 7 Cir., 135 F.2d 569, where the Court said at page 573:

" * * * But the purely subjective intention in the abandoner's mind to re-engage in a former enterprise at some indefinite future time is not sufficient to avoid abandonment where an objective analysis of the situation furnishes ample evidence to warrant the inference of abandonment. *Golenpaul v. Rosett,* 174 Misc. 114, 18 N.Y.S.2d 889; *American Photographic Pub. Co. v. Ziff-Davis Pub. Co.,* 127 F.2d 308 [29 CCPA 1014], * * *."

See also: *Anderson v. National Broadcasting Co.,* 178 F.Supp. 762, 765–766 (S.D.N.Y.1959); *Heras v. Mena,* 152 U.S.P.Q. 526 (Sup.Ct. N.Y. County 1966).

In this case First-Quill discontinued its pen and pencil business for four years and it is of no avail to say they did not intend to abandon the tops in question. Evidence was introduced showing that First-Quill after it discontinued manufacturing, nevertheless accepted orders and did ship 5,000 to 15,000 pens between 1968–1972. However, it is equally true that these shipments were sporadic and not of an on-going business. It is difficult for this Court to understand how Second-Quill can press this issue and argue that First-Quill remained sufficiently active in the pen and pencil business after 1968 as to overcome any question of abandonment of the trademark. If that were a controlling issue this Court would and could hold that proof of abandonment reached the level of a criminal case—beyond a reasonable doubt. Here it is obvious that in 1968 the pen and pencil business was discontinued and all effort went into the hermetic seal business; promotion stopped, salesmen were dropped; no solicitations of any kind were made and any shipment of pens and pencils that were made were out of a left over inventory and amounted to approximately $12,000 gross over a "two or three year" period, as against "millions of dollars" (Tr. p. 62) from the hermetic seal business. No separate records were kept and there was not any clear evidence that they even knew where part of their old equipment and inventory was. Though they continued repairing some pencils and pens returned, they had no record of such activity. I need not labor this point any further.

er and do not offer much more enlightenment than those of Quill. By letter of January 27, 1978, in response to the Court's request for more specific citations, Cross offered the following: *Rockowitz Corset & Brassiere Corporation v. Madam X Co., Inc.,* 248 N.Y. 272, 162 N.E. 76 (T.M. Rep. 450, 1928); *Mayer Fertilizer & Junk Company v. Virginia—Carolina Chemical Company,* 35 App.D.C. 425 (D.C.Cir. 1910).

From *Rockowitz,* at 79, counsel quoted the following statement:

This court likewise said in *Falk v. American West Indies Trading Co.,* 180 N.Y. 445, 73 N.E. 239 . . .

"A trade-mark is not a piece of property that passes from hand to hand by assignment separate from the business of the owner of the trade-mark or of the article which it may serve to distinguish. Generally, it passes only with the business and goodwill of which it is an inseparable part."

The plaintiff's predecessor had no business in which to use a trade-mark. It hung in the air for eight years.

In *Mayer Fertilizer,* two concerns each claimed the same trademark for fertilizer; one claimed by an assignment after an abandonment. The court said at pp. 400, 401,

This assignment is attacked by appellant on the ground that it was a mere transfer of the right to use the trade-mark unaccompanied by a sale of the business with which it was associated.

A trade-mark cannot be assigned, or its use licensed, except as incidental to the transfer of the business or property in connection with which it has been used. (*Macmahan Pharmacal Co. v. Denver Chemical Mfg. Co.,* 113 F. 468 [51 C.C.A. 302].)

This is too well settled to require further discussion or citation of authority. . .

\* \* \* \* \* \*

In this case, the Southern Fertilizing Company wound up its affairs and abandoned its business. Necessarily, its goodwill became extinct. There was nothing tangible to which it might attach. What is included under the term good-will varies almost in every case, but it is a matter distinctly appreciable, which may be preserved (at least to some extent), if the business be sold as a going concern, but which is wholly lost if the concern is wound up, its liabilities discharged, and its assets got in and distributed. (*Wedderburn v. Wedderburn,* 22 Beavan, 84.) The same requisites to a valid assignment of a trade-mark are essential to a valid transfer of the good-will. If, therefore, the assignment was insufficient to convey the right to use the trade-mark, it is without effect to transfer the good-will. The good-will of an establishment is an accessory thereto; separate therefrom, it is of no value. And the same rule applies to trade-marks. (*Upton on Trade-Marks,* 27.)

But in *Rockowitz* and *Mayer* there was no contract formed between two existing and operating businesses as in this case.

Here, Cross chose not to test the validity of its mark and so it settled the case with First-Quill. Cross did not transfer any of its business or good will. When the contract was made, the mark had not been abandoned. The trademark was not assigned by that contract and as a consequence First-Quill did not acquire any part of the trademark—which of course it could not. All it got was a contract right to be free of suit even if it manufactured and sold certain specified writing instruments, together with the right to assign the benefits under the agreement to its "successors in business and assigns". The settlement agreement has no provision conditioning First-Quill's assignable right to be free of suit for the manufacture and sale of writing instruments, like exhibits C, D and F, only if it maintained a certain level of business activity with respect to pens. To so hold would be to read into the contract that which does not exist. This cannot be done under the Rhode Island law which the contract made determinative. *Providence Ice Cream Co. v. Bowen,* 44 R.I. 173, 182, 114 A. 186 (1921); *Flanagan v. Kelly's System of New England, Inc.,* 109 R.I. 388, 392, 286

A.2d 249 (1972). Finally, since Cross' agreement is not one to provide personal services, the benefits themselves were assignable. *Koury v. Sood*, 74 R.I. 486, 62 A.2d 649 (1948); *Swarts v. Narragansett Electric Lighting Co.*, 26 R.I. 388, 59 A. 77 (1901); *reh. den.* 26 R.I. 436, 59 A. 111 (1901).

Cross asserts in its brief,

a contract relating to real estate, to the sale of a ship or to a material settlement are all contracts and are to be enforced. By saying each is a contract, one just starts towards a conclusion. The appropriate law is to be applied. Real estate law is to be applied to a realty contract, admiralty law to a ship's contract and family law to a marital settlement. Similarly, a contract settling a trademark dispute is governed by trademark law. The 1967 Settlement Agreement settled a trademark litigation. It is obligatory to apply trademark law to it. (Findings of Fact and Conclusions of Law proposed by Cross at p. 6)

■ If defendants mean to suggest that the parties cannot agree between themselves by contract as to their respective rights, so long as that agreement does not violate the public interest, then this Court disagrees. As plaintiffs have pointed out, courts have repeatedly held that contracts with respect to the use of trademarks may abrogate a legal defense, constitute an estoppel or signify consent to use. *See Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 6 Cir., *cert. denied* 414 U.S. 1033, 94 S.Ct. 465, 38 L.Ed.2d 326 (contract precluding defense that a trademark is merely descriptive); *E. F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512, 522 (6th Cir. 1943), *cert. denied,* 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060 (1944) (party estopped by contract from claiming ownership; also "the law of contract is controlling rather than principles applicable to trademark law" at 520); *Croton Watch Co. v. Laughlin*, 208 F.2d 93, 95–97 (2d Cir. 1953) (contract arising from compromise in litigation may constitute consent to use of a trademark); *Peyrat v. L. N. Renault & Sons, Inc.*, 247 F.Supp. 1009 (S.D.N.Y.1965) ("parties to a trade-

mark controversy may contract between themselves for any legal purpose").

Moreover, both counsel for the litigants, who are of superior ability and standing in this legal community, and the Court could find no law prohibiting a trademark holder, wishing to avoid a legal judgment, from promising a competitor not to sue for trademark infringement and contracting with it to make this promise assignable without a limitation of time or a requirement of continuing business operation.

■ However, courts do not enforce contracts against public policy. Thus the courts in the above cited cases have determined whether contract enforcement would lead to an impermissible confusion of the consuming public, a danger against which trademark law guards. In these cases, courts weighed the public interest concerning trademarks against the interest in contract enforcement. *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d at 328, 329 ("weigh the public benefit in considering trademark principles in connection with the policy of upholding the law of contracts"). In that case, the court concluded that a party could not challenge a trademark as a descriptive word because by contract it had lost that defense. In deciding this, the court balanced the interest in "guarding against the depletion of the general vocabulary" of descriptive words against the contract interest that "a person should be held to his undertakings". *Id.* at 329.

Similarly, in *Peyrat v. L. N. Renault & Sons, Inc.*, the court reviewed a contract permitting the importation of brandy under the same name as that used by the defendant in selling its wines. While affirming the importance of holding parties to their contracts and protecting reliance, the court nonetheless concluded that a contract which led to "(c)onfusion as to the source of origin of a consumer product would be the type of injury which must be prevented" by a refusal to enforce the contract. However, the court then found that the wine and brandy markets differed sufficiently to prevent public confusion of the names.

Also in *Croton Watch Co. v. Laughlin,* the court reviewed a contract, made in settlement of litigation, which permitted the importation of a watch. The court found that a contract which required the use of a certain differentiating name on the watch sufficed to prevent public confusion.

In this case the Court must balance the public interest against confusion, one of the significant purposes of trademark law, against the interest in enforcing contracts and protecting the reliance they induce.

The Court must also add into this balance the interest in encouraging extra-judicial settlement of trademark litigation. Insisting that a court review a settlement to assure that no public confusion will result would make such agreements of little value to the parties. Parties would sensibly conclude that they might better litigate the issue of confusion to conclusion rather than reach a settlement which might later be found to be unenforceable. Such a premium on litigation would lead to a further drain on judicial resources. Moreover, we note the advantage of allowing business persons to determine whether their self-interest is better served by making such contracts or not. This Court is not so sanguine as the United States Court of Custom and Patent Appeals was in *Application of E. I. Dupont De Nemours & Co.,* 476 F.2d 1357, 1362–63 (Cust. & Pat.App.1973) that the self-interested determinations of business persons will always protect the public interest; nonetheless, we note with approval that, in determining whether the public interest in non-confusion is harmed, the Patent Court gives deference to the contractual agreements of business-persons that permit trademark use.

▉ The balance strongly favors enforcement of the contract. But having already found that a likelihood of confusion exists in this case, we must determine whether this necessarily makes the contract against public policy. I conclude that it is not.

The Court notes first that the contract itself was not formed with any intent to deceive the public. It quite specifically consents to the manufacture of only those pens which bear a Quill insignia as a distinguishing characteristic.

Second, a trademark protects two different interests: a business' interest in its good will and the public interest in obtaining the quality of goods which it associates with a particular mark. The test for determining whether each is realized is that of "confusion." But when a court using the "confusion" test considers whether or not to enforce a contract, it should be careful not to afford a business more protection for its interests than it sought through contract. Cross voluntarily contracted with First-Quill in a way which allowed for the possibility of confusion. The problem facing a court with regard to the public interest is different. We find important the absence of an allegation that Quill pens are inferior to Cross pens. If a consumer should buy a Quill pen thinking it is a Cross pen, there is no proof that he would be obtaining an inferior product. The harm to the public then is not significant, and this is so even though a consumer might claim harm because he sought the prestige of Cross but got Quill instead. With regard to his interest, this Court joins the spirit of the *Dupont* Court in leaving it up to Cross to protect the tastes which it has created for its products.

I have found that the Quill label on the pen is not sufficient to negate confusion as to permit Quill to appropriate the Cross shape, which certainly possesses a positive emotional valence for many pen purchasers.

On balance the interest in enforcing contracts, protecting reliance and encouraging settlements, the fact that confusion will not lead to the purchase of an inferior product, the lack of intent to deceive by the contracting parties as is evidenced by the presence of the Quill insignia, all lead this Court to hold that the contract is not against public policy and, therefore, should be upheld.

The plaintiffs have lived up to their part of the bargain. Cross is prohibited by its contract from cross-claiming against

Second-Quill for unfair competition and trademark infringement.

In summary, I find—

1. The Cross trademarks 543,934 and 827,167 as discussed herein are valid.

2. Exhibits C, D and F infringe the Cross trademarks.

3. Cross has consented to Second-Quill's acts and is estopped from suing on the infringement of its trademarks or unfair competition by the manufacture of writing instruments like .exhibits C, D and F, by virtue of the agreement, exhibit 2, between Cross and First-Quill dated November 29, 1967.

4. To the extent recited in 1, 2 and 3 Cross' counterclaim is denied.

An order will be prepared accordingly by Quill.[6]

So ordered.

---

**6.** In view of this finding that Cross is prohibited from suing Second-Quill, the Court would have been justified in not deciding the questions of validity or infringement. However, since this case will, in all probability, be reviewed on appeal this Court felt judicial economy would best be served by ruling on all issues. Finally, the Court feels constrained to note that counsel for Second-Quill, quite justifiably pointed out in his brief certain of the Court's comments in the course of trial such as are recorded on pp. 306–307; pp. 276–277 concerning likelihood of confusion. Now, of course, a noisy judge is no "well tuned symbol" but by the same token when sitting without a jury, it would be a disservice not to provoke clarification of the evidence and focus argument on troublesome points. Whatever comments I made were for this purpose.